FRANSON, J.
Launa Morton appeals from a judgment entered in a marriage dissolution proceeding, contending the trial court erred in determining (1) child support, (2) spousal support, (3) attorney fees, and (4) her former husband's interest in an oilfield service business was a gift from his father and, therefore, was his separate property even though acquired during the marriage.
The published parts of this opinion address issues related to determining the income available for child support and to awarding attorney fees under Family Code section 2030.[1] First, we conclude Launa has established the child support award in the June 2016 judgment was based on the erroneous exclusion of respondent David Morton's income tax refunds from his net income available for child support. Second, we conclude the exclusion of David's voluntary contributions to a 401(k) retirement savings plan from his net income available for child support was error, unless on remand the trial court provides findings that justify the exclusion of all or part of those contributions from David's income. (See § 4059, subd. (c).)
As to attorney fees, we conclude the trial court erred in declining to award Launa additional attorney fees at the conclusion of the proceeding. Pursuant to mandatory language added to section 2030, subdivision (a)(2) by the Legislature in 2010, "the court shall make an order awarding attorney's fees and costs" if the findings required by that subdivision "demonstrate disparity in access and ability to pay." The issues on which the statute requires findings include "whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties." ( § 2030, subd. (a)(2).) On a novel question of statutory interpretation, we conclude a trial court must make explicit findings on the issues listed in subdivision (a)(2) of section 2030. Here, the record clearly demonstrates a "disparity in access and ability to pay" and, as a result, a further award of attorney fees and costs was mandatory.
The unpublished parts of this opinion resolve the following issues. First, substantial evidence supports the trial court's explicit finding that David acquired the interest *411 in his father's Huddleston Crane business as a gift and its implicit finding that the gift was not remuneratory. Consequently, the trial court did not err in determining David's ownership interest in the business was his separate property. Second, the questions involving the child support award in the June 2016 judgment are not moot. Third, the calculation of that child support award erroneously failed to account for the percentage of time each party had custody of their daughter and did not properly analyze David's voluntary contributions to a health savings account (HSA) in determining his net income available for child support. Fourth, as to permanent spousal support, the trial court's determination of David's income for purposes of evaluating his ability to pay support erroneously excluded David's California and federal income tax refunds and did not properly analyze David's voluntary contributions to a 401(k) plan and to a health savings account. Fifth, the trial court's finding that David's net rental income is $7,650 per month-a finding that affects both the child support and the spousal support calculations-is supported by substantial evidence and, therefore, will be upheld.
We therefore reverse the judgment in part and remand for further proceedings regarding child support, spousal support and attorney fees.
FACTS
David was born in 1965, graduated from high school and attended Taft College for two years. Starting in high school, David worked weekends and part time for his father's business, Huddleston Crane. He finished college a few units short of receiving an AA degree in petroleum technology. After college, David worked full time for Huddleston Crane as a mechanic, truck driver and crane operator.
Launa was born in 1967 and was employed as a hairdresser for approximately eight and one-half years. Launa and David married in April 1991. In March 1996, Launa stopped working because she was pregnant with their first child. She was a stay-at-home mother for the rest of the marriage. They had two children, a son born in 1996 and a daughter born in early 1998. Launa and David separated in July 2012, after 21 years of marriage. In June 2016, their youngest child graduated from high school and was over the age of 18.
Huddleston Crane started doing business as an oilfield service company around 1940. David's father, John Morton (Father), acquired the business sometime before 1984 and owned and operated it as a sole proprietorship. When purchasing assets for the business, Father preferred to pay cash and was able to do so by accumulating profits and reinvesting them in the business. This approach avoided debt and was prudent because of the extreme volatility in the oilfield service business, which could result in dramatic variations in income from year to year.
The Partnership
In 1992, Father changed Huddleston Crane Service's form of business organization from a sole proprietorship to a partnership. According to his accountant, Father's goals were to (1) receive $10,000 per month from the business until he died or retired; (2) transfer ownership of the business to his son and son-in-law, David and David Noerr (Noerr),[2] without costing them anything and allowing them to continue to receive more than reasonable compensation for their services; and (3)
*412 structure the transaction to minimize or eliminate income and sales taxes. Father contributed the assets of the sole proprietorship to the partnership, which constituted 100 percent of its capital. The other two partners, David and Noerr, contributed no capital and their capital accounts started at zero. Father received the right to 10 percent of the partnership's future profits, while David and Noerr each received a right to 45 percent of future profits. The profits were credited to the partners' capital accounts. A partner's draws reduced his capital account.
The record contains a copy of David's Schedule K-1 (Form 1065) from the partnership for the year ending December 31, 1993. The Schedule K-1 lists David's percentage of profits and losses at 45 percent and his ownership of capital at one percent. David's Schedule K-1 contains an "[a]nalysis of partner's capital account" that states (1) David's capital account at the beginning of the year was $1,095; (2) his share of income and loss was $23,275; (3) his withdrawals and distributions were $65; and (4) his capital account balance at year's end was $24,305. If the statement that David owned one percent of the partnership's capital was accurate, the total capital of the partnership at the end of 1993 was approximately $2.4 million.
Huddleston Crane Services, Inc.
On August 1, 1997, articles of incorporation for a corporation named "Huddleston Crane Services, Inc." were filed with the California Secretary of State. On September 1, 1997, at the first meeting of the board of directors of the new corporation, the directors adopted bylaws for Huddleston Crane Services, Inc. and Noerr was named board chairman, president, chief financial officer and secretary. David was named vice president. Father, David and Noerr each were issued 10,000 shares of stock. For tax purposes, Huddleston Crane Services, Inc. is a subchapter S corporation.[3]
Huddleston Crane Services, Inc. was formed as part of a reorganization of the partnership. This reorganization resulted in Father, David and Noerr become equal owners of the business. In effect, David exchanged the value in his capital account in the partnership and his right to 45 percent of future profits for a one-third ownership interest in the business's equity and future profits. Noerr made the same exchange. In comparison, Father exchanged the value of his capital account and his right to receive 10 percent of future profits for a one-third ownership interest in the business's equity and future profits. The appellate record contains no evidence of the value of the partners' capital accountants immediately before the partnership's reorganization as a corporation. As a result, it is not possible to determine who, if anyone, the exchange favored.
H.C.S. Mechanical, Inc.
H.C.S. Mechanical, Inc. is a California corporation incorporated on January 4, 2000. The same day, its bylaws were executed by all four of its directors. H.C.S. Mechanical, Inc. issued 2,600 shares to Noerr, 2,500 shares to David, 2,500 shares to Butch Hall, and 2,400 shares to Dennis *413 Perreault. These shareholders were the four original directors.
H.C.S. Mechanical, Inc. owns equipment that it rents to Huddleston Crane Services, Inc. for use.[4] For income tax purposes, H.C.S. Mechanical, Inc. is a subchapter S corporation.
Sometime no later than early 2006, David and Noerr had become the only shareholders and directors of H.C.S. Mechanical, Inc. Tax documents from 2011 state David owned 50 percent of the corporation's stock and Noerr owned the other 50 percent.
Papers filed by Launa in the trial court refer to "Huddleston Crane Services, Inc. and its wholly owned subsidiary HCS Mechanical, Inc."[5] This description of a parent-subsidiary relationship between the two corporations is not supported by the record. California's General Corporation Law ( Corp. Code, § 100 et seq. ) defines the terms "parent" and "subsidiary." ( Corp. Code, §§ 175, 189.) When one corporation owns, directly or indirectly, more than 50 percent of the voting power of a second corporation, the second corporation is a "subsidiary" of the first. ( Corp. Code, § 189, subd. (a) ; see Black's Law Dict. (8th ed. 2004) p. 367 ["parent corporation" means a "corporation that has a controlling interest in another corporation (called a subsidiary corporation ), usu. through ownership of more than one-half of the voting stock"].)
Here, the corporate records show the shares of H.C.S. Mechanical, Inc. are owned directly by David and Noerr. Also, the tax returns in the record, including the 2011 Schedule K-1's (Form 1120S) for H.C.S. Mechanical, Inc. identify David and Noerr as shareholders. Schedule E to David's 2014 federal tax return show David receives income from both corporate entities, which implies the income from H.C.S. Mechanical, Inc. is received directly by David and is not channeled to him through a parent corporation. These documents and the other evidence in the record establish that H.C.S. Mechanical, Inc. is not a subsidiary (wholly owned or otherwise) of Huddleston Crane Services, Inc.
Father's Exit from the Business
Around 2004, Huddleston Crane Services, Inc. repurchased Father's shares in the corporation and retired those shares. After this repurchase, David and Noerr each owned 50 percent of the corporation's outstanding shares. Father died in 2007.
Taft Property
In 2004, David and Launa purchased just over six acres of real property in Taft, California. They paid $230,000 for the *414 property and made an additional $200,000 in improvements. The property contains several out buildings, including two butler buildings, and corrals and stalls for the parties' horses.
In September 2012, David moved from the house to a detached garage, living there until June 2, 2013. David surrendered his key to the house, but continued to have access to the butler buildings, one of which contained his office. Launa retained possession and use of the residence and maintained the horses and other livestock that were community assets. The court ordered the property sold. In July 2015, it sold for $600,000. The property was no longer subject to a mortgage and each party received one-half of the net proceeds from the sale.
David's Income
The main sources of David's income are the wages he earns and the S corporation income. Tax returns for 2009 through 2011 show his wage income as $93,485, $88,653 and $81,083. The S corporation income reported on his income tax returns for these years was $313,671, $124,132, and $835,575. David's 2014 federal tax return reported wage income of $84,236 and S corporation income of $588,289.
David's cash flow is significantly less than the income reported on his tax returns because the S corporations retain a significant portion of the earnings for use as capital in the business.[6] The corporations distribute sufficient funds for David and Noerr to make the necessary quarterly estimated tax payments to both the federal government and California's Franchise Tax Board and to cover any tax owed on the final tax return. As to direct cash flow from Huddleston Crane Services, Inc., David and Noerr each receive two monthly checks-one for $6,100 and the other for $4,050-which David describes as "for equipment rental."
As to the 2014 cash flow from David's weekly paycheck of $2,113.77, that amount was reduced by total withholdings of approximately $400 for state and federal income tax, social security, Medicare and disability. The gross amount of the paycheck also was reduced by deductions for health insurance ($58.85), contributions to the 401(k) plan ($317) and contributions to a health savings account ($118). With these reductions, David's net pay came to approximately $1,220 per week. David's income and expense declaration dated January 12, 2015, stated the net amount of wages or salary received each month averaged $5,286.
PROCEEDINGS
In August 2012, Launa filed a petition for dissolution of marriage. She also filed a request for pendente lite orders addressing (1) child custody, visitation and support; (2) spousal support; (3) property control; and (4) a business evaluation by a forensic accountant appointed pursuant to Evidence Code section 730.
In November 2012, Launa was awarded temporary spousal support of $6,000 per *415 month and further hearings were scheduled. After evidentiary hearings in January and March of 2013, the trial court issued a written ruling on April 19, 2013. Temporary spousal support was reset at $3,029 per month. The court denied Launa's request to join Huddleston Crane Services, Inc. as a party and denied her request for an expert evaluation of the business. Based on the evidence presented up to that point, the court determined David's interest in the business was acquired by gift and, therefore, was separate property. The court stated: "Absent evidence of the community's interest in the corporation, the court does not believe it necessary or appropriate to value the business at this time."
At a July 2013 hearing on a motion to reconsider, a number of issues were discussed. The trial court clarified a point by stating its determination that David's interest the corporation was separate property was made without prejudice to the final characterization of that interest. The parties and court agreed the characterization of David's interest in the business would be addressed in a bifurcated trial after Launa conducted additional discovery.
In October 2013, the trial court entered findings and order after hearings that awarded Launa temporary child support of $981 for the parties' son and $1,634 for their daughter. The order also awarded temporary spousal support of $2,774 per month. The order included a DissoMaster report that showed the court's determinations of various factors relevant to calculating the support payments. The order denied without prejudice Launa's request for the valuation of Huddleston Crane Services, Inc. and any related corporations. The court concluded that the ownership interest of David was obtained as a gift from Father.
In December 2014, about a year and a half after David moved from the Taft property, he requested an order directing the sale of the residence. David also requested an order directing Launa to pay the community a Watts charge for the use of the property.[7]
In April 2015, evidentiary hearings were held on the issue of whether David's interest in the family business should be characterized as separate or community property. These hearings supplemented the testimony received during hearings held in January and March 2013. On August 31, 2015, the court filed its ruling, which included the findings that "David's interest in Huddleston Crane Services, Inc. was acquired by gift and that this interest is his separate property." On October 13, 2015, the trial court filed a judgment on reserved issues to implement its ruling as to the characterization of David's interest in the family business.
In March 2016, the court filed a judgment of reserved issues to implement the parties' stipulation as to the division of many other items of property. For example, the judgment stated two motorcycles and six all-terrain vehicles (ATV) belonged to their son, while a 2012 Polaris Razor, a 2006 Yamaha ATV, and 2006 Yamaha Blaster belonged to their daughter. Launa received (1) a 2011 Chevrolet Suburban, (2) a 1995 Chevrolet sedan, (3) a 2006 *416 Schwinn motorcycle, (4) a 2004 Honda motorcycle, (5) six ATV's, (6) a 1996 Winnebago motorhome, (7) a 2004 Tommy utility trailer, (8) a 1997 Apache Carrier horse trailer, (9) three horses and tack, and (10) the furniture, furnishings, guns and shop tools then in her possession. Launa also received one-half of the remaining sale proceeds generated by the July 2015 sale of the family residence, subject to certain equalization charges and the subsequent determination of a Watts charge. She also received one-half of David's account in a 401(k) plan and one-half of a brokerage account maintained at Stifel Nicolaus. The 401(k) account had a balance of approximately $285,150 as of July 31, 2012, and the brokerage account had a balance of approximately $245,668 as of June 30, 2015.
The March 2016 judgment also confirmed the trial court's decision that the 50 percent ownership interest David held in Huddleston Crane Services, Inc. and its related entity, H.C.S. Mechanical, Inc., was David's separate property. In April 2016, Launa filed a notice of appeal from the March 2016 judgment for the purpose of challenging this characterization of David's interest in the family business.
The March 2016 judgment also identified six remaining issues, including child support for the daughter, permanent spousal support, and any Watts charge. These issues were submitted to the court on January 25, 2016, when briefing was completed.
In April 2016, the court served a proposed statement of decision. Launa filed objections to the proposed statement of decision stating, among other things, that the decision did not address the issue of child support for the daughter, who had turned 18 earlier that year and was scheduled to graduate from high school on June 1, 2016. In May 2016, the trial court issued a ruling addressing the objections to the statement of decision. The ruling included a footnote stating: "The Court notes that it has made previous orders concerning the payment of child support by [David]. The existing orders for child support shall continue until statutory termination or further order of the Court." The ruling also denied Launa's request for an additional $115,134.65 in attorney fees and directed her counsel to prepare a judgment on the reserved issues for the court's signature.
On June 10, 2016, the trial court filed a judgment on reserved issues. The judgment continued the 2013 child support order, which required David to pay $1,634 in child support for his daughter until she reached the age of 18 and was not a full-time high school student. As to spousal support, the judgment directed David to pay Launa $2,700 per month beginning on April 1, 2016, until statutory termination or further order of the court. As a charge for Launa's exclusive use of the family residence for approximately 25 months, the court determined Launa should reimburse the community in the amount of $25,000. The judgment also reflected the court's denial of Launa's request for additional attorney fees.
In August 2016, Launa filed a notice of appeal from the judgment entered on June 10, 2016. She also requested this court to consolidate the appeal (case No. F074243) with her earlier appeal from the March 2016 judgment (case No. F073689). We granted her request and directed that only one record on appeal be prepared for the consolidated matters.
DISCUSSION
I. CHARACTERIZATION OF THE
*417 BUSINESS**
II. CHILD SUPPORT
A. Basic Principles
1. Statewide Child Support Guideline
Child support awards in California are governed by the legislation that established a statewide uniform child support guideline. (See §§ 4050-4076.) "The court shall adhere to the statewide uniform guideline and may depart from the guideline only in the special circumstances" identified in the statute. (§ 4052.) The child support guideline is a mathematical formula set forth in section 4055 and the amount generated by the formula is presumptively correct. (§§ 4053, subd. (k), 4057, subd. (a).) The presumption can be rebutted with evidence of the factors set forth in section 4057, subdivision (b).
The "total net monthly disposable income of both parties" is a component of the formula used in the statewide uniform guideline for determining child support. (§ 4055, subd. (b)(1)(E).) Monthly net disposable income usually is computed by dividing the annual net disposable income by 12. "The annual net disposable income of each parent shall be computed by deducting from his or her annual gross income the actual amounts attributable to" items listed in the statute. (§ 4059.) Those deductions include (1) state and federal income tax liability, (2) contributions to the Federal Insurance Contributions Act (FICA), (3) amounts paid for retirement benefits if participation is required as a condition of employment, and (4) health insurance or health plan premiums for the parent or any children the parent is obligated to support. (§ 4059, subds. (a)-(d).) The term "annual gross income," which is used in the calculation of annual net disposable income, is defined in section 4058 to mean income from whatever source derived, except child support payments actually received and income derived from any need-based, public assistance program. (§ 4058, subds. (a), (c).)
2. Standard of Review
Child support awards are reviewed for an abuse of discretion. ( In re Marriage of Cheriton (2001) 92 Cal.App.4th 269, 282, 111 Cal.Rptr.2d 755 ( Cheriton ).) In conducting this review, appellate courts determine whether the trial court's factual findings are supported by substantial evidence and whether the trial court reasonably exercised its discretion-that is, whether any judge reasonably could have made such an order. ( In re Marriage of Alter (2009) 171 Cal.App.4th 718, 730-731, 89 Cal.Rptr.3d 849 ( Alter ).)
The concept of a reasonable exercise of discretion means that trial courts must follow established legal principles. ( Alter , supra , 171 Cal.App.4th at p. 731, 89 Cal.Rptr.3d 849.) In the context of child support awards, which are highly regulated by the statewide uniform guideline, the only discretion trial courts possess is the discretion provided by statute or rule. ( In re Marriage of Smith (2001) 90 Cal.App.4th 74, 80-81, 108 Cal.Rptr.2d 537.)
B. Trial Court's Determinations
1. Temporary Support
The court's October 2013 order established the amount of temporary support[8] for the two minor children at $2,615 per month commencing on August 13, 2012. The order directed the payment of child support until a further order of the *418 court, until the child reached age 19, or until the child reached age 18 and was not a full-time high school student, whichever occurred first. The child support consisted of $981 per month for the son born in 1996 and $1,634 for the daughter born in 1998.
The order included a DissoMaster report for 2013, which had entries for both presumed and basic child support of $2,615. The DissoMaster report listed David's other nontaxable income and his net (adjusted) income at $12,968 per month. It also listed David's net spendable income at $7,579, which equaled his net (adjusted) income of $12,968 minus $2,615 in child support and $2,774 in spousal support. The net (adjusted) income figure of $12,968 per month was based on (1) $5,001 in wages available for support, (2) net rental income of approximately $7,650 ($10,150 less a $2,500 payment to David's mother), (3) one-half of the miscellaneous interest and dividend income of $1,800, minus (4) other adjustments.
2. Permanent Support
In October 2015, the trial court held a bench trial on the remaining issues not resolved by the parties' stipulation, which included child support for the daughter and permanent spousal support. In April 2016, the court served a proposed statement of decision. Launa filed objections to the proposed statement of decision stating, among other things, that the decision did not address the issue of child support for the daughter, who had turned 18 earlier that year. Launa's objection represented to the court that the daughter was scheduled to graduate from high school on June 1, 2016.
In May 2016, the trial court issued a ruling addressing the objections to the statement of decision. The ruling included a footnote stating: "The Court notes that it has made previous orders concerning the payment of child support by [David]. The existing orders for child support shall continue until statutory termination or further order of the Court."
On June 10, 2016, the trial court filed a judgment on reserved issues. The judgment continued the 2013 child support order by requiring David to pay $1,634 in child support for his daughter until she reached the age of 18 and was not a full-time high school student.
C.-D.***
E. 2016 Child Support-Tax Refunds
1. Statutory Provision and Its Meaning
As described in part II.A.1., ante , the calculation of a parent's net disposal income involves reducing the parent's annual gross income by deducting items specified in the statute. (§ 4059.) One of those deductions is "the actual amounts attributable to ... [t]he state and federal income tax liability resulting from the parties' taxable income." (§ 4059, subd. (a), italics added.) Subdivision (a) of section 4059 also states:
"Federal and state income tax deductions shall bear an accurate relationship to the tax status of the parties (that is, single, married, married filing separately, or head of household) and number of dependents. State and federal income taxes shall be those actually payable (not necessarily current withholding) after considering appropriate filing status, all available exclusions, deductions, and credits." (Italics added.)
This text makes no reference to income tax refunds. Consequently, the following question of statutory construction is presented: When a trial court has excluded all *419 of a parent's income tax withholdings and estimated income tax payments from that parent's income, how should the court treat income tax refunds when calculating a parent's annual net disposable income under section 4059? As explained below, we conclude the state and federal income tax refunds should be included in the annual net disposable income.
This question of statutory construction involving income tax refunds and section 4059 does not appear to have been answered in a published decision. Consequently, we begin with the words used in the statute, giving them their usual and ordinary meaning, because statutory language generally is the most reliable indicator of legislative intent or purpose. ( People v. Castillolopez (2016) 63 Cal.4th 322, 329, 202 Cal.Rptr.3d 703, 371 P.3d 216.) When statutory language is ambiguous, courts must adopt the interpretation that best effectuates the legislative intent or purpose. ( Beal Bank, SSB v. Arter & Hadden, LLP (2007) 42 Cal.4th 503, 508, 66 Cal.Rptr.3d 52, 167 P.3d 666.)
The words of particular interest include the phrase "actual amounts attributable" in section 4059's lead-in to the specific deductions. (§ 4059.) Also, the word "liability" is used in the income tax deduction's reference to "state and federal income tax liability ." (§ 4059, subd. (a), italics added.) Most significant for our purposes is the phrase "actually payable" in the sentence that contrasts taxes actually payable with current withholding for taxes. That sentence provides: "State and federal income taxes shall be those actually payable (not necessarily current withholding ) after considering appropriate filing status, all available exclusions, deductions, and credits." (§ 4059, subd. (a), italics added.)
The amounts withheld for state and federal income taxes on a taxpayer's W-2 and 1099 forms and the amounts of the quarterly estimated tax payments to California (form 540-ES) and the federal government (form 1040-ES) are not the "actual amounts attributable" to "state and federal income tax liability" and are not the taxes "actually payable." (§ 4059, subd. (a).) The statute explicitly contrasts taxes actually payable with current withholdings and warns that they are not necessarily the same. Instead of representing the actual amount of a parent's tax liability (i.e., the amount actually payable), the amounts withheld and the amounts of estimated tax payments are intended to cover most or all of the taxpayer's final tax liability-a liability calculated on income tax returns prepared after the close of the tax year and usually filed on or before the 15th of April. Consequently, the amounts withheld and the amounts of estimated tax payments are estimates or predictions related to an income tax liability that ultimately will be determined sometime after the amounts have been withheld and the estimated payment submitted. Therefore, we conclude that the subtraction of withholdings and estimated tax payments from the parent's gross income does not end the calculation set forth in subdivision (a) of section 4059. Refund amounts must be taken into account.
The Legislature's recognition that taxes actually payable are not necessarily equal to current withholdings is consistent with judicial decisions in child support cases from other jurisdictions. Those cases have recognized the inaccuracy of withholdings when addressing how income tax refunds relate to the income used to calculate child support payments. (See e.g., Ready v. Ready (Wyo. 2003) 76 P.3d 836 [1999 overpayment caused significant tax refund to be received in 2000; refund was included in income used to calculate father's child support obligation] ( Ready );
*420 In re Marriage of Pylawka (1996) 277 Ill.App.3d 728, 733, 214 Ill.Dec. 651, 661 N.E.2d 505, 509 [income tax refund should be added back to parent's net income when determining child support obligation under Illinois statute] ( Pylawka ).)
The Illinois child support statute provides a comparison useful in this case because it allows for the deduction of federal income tax from gross income to determine the parent's net income used for purposes of calculating child support. ( In re Marriage of Ackerley (2002) 333 Ill.App.3d 382, 390-391, 266 Ill.Dec. 973, 775 N.E.2d 1045, 1053-1054 ; see 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 504, p. 567 [persuasive value of decisions of sister state courts].) To address overwithholding of salary or wages on a parent's W-2 forms, Illinois courts use two approaches. ( Ackerley, supra, 266 Ill.Dec. 973, 775 N.E.2d at pp. 1053-1054.) The first calculates a parent's net income by deducting the actual federal income tax paid from the actual total income received. ( Ibid . ) The second "begin[s] with net income and add[s] back in any refunds, which represent overwithholding." ( Ibid . ) The approaches recognize that if income tax refunds were excluded from the calculations, it would allow a parent owing a support obligation to manipulate his or her net income simply by overwithholding. ( Pylawka , supra , 214 Ill.Dec. 651, 661 N.E.2d at p. 509.) The potential for inaccuracy or manipulation also was recognized by the Wyoming Supreme Court:
"A review of the record in this case shows that the court considered the father's receipt of a significant tax refund in 2000 for overpaid 1999 taxes as a matter affecting his cash flow during the year 2000. The father would have us base his child support obligation not on his actual after-tax income, but rather on an income that is artificially reduced by temporary overpayment of taxes. That would not comport with the statutory and case law definitions of income." ( Ready , supra , 76 P.3d at p. 840.)
Based on the text of section 4059 and the tax refund cases from other jurisdictions, we conclude California's statute requires the parent's state and federal income tax refunds to be added to the parent's annual net disposable income when all of the parent's income tax withholdings and estimated income tax payments have been deducted from his or her gross income. A contrary statutory interpretation would allow a parent to manipulate his or her income by overwithholding or overpaying estimated tax payments.
2. Tax Payments and Refunds-2008 to 2011
The evidence in this case includes the parties' federal tax returns from 2008 through 2011, the four years prior to the filing of the dissolution proceeding in 2012. Those tax returns show they overpaid their federal income tax in 2008 ($17,294) and 2010 ($28,403). The 2008 overpayment was applied to the next year's taxes and $17,905 of the 2010 overpayment was taken as a refund. In contrast, their withholdings and estimated tax payments for 2009 and 2011 were less than the federal income tax owed by $25,884 and $81,513, respectively. The federal tax liability for 2011 was paid by check number 5323 dated April 16, 2012, and drawn on their joint checking account at United Security Bank.
The parties' California income tax returns for 2009 through 2011 show overpayment of taxes of $1,969 and $3,207 in 2009 and 2011, respectively. Most of the overpayments were applied to estimated tax payments for the next year. The 2010 return shows they underpaid their taxes and owed $9,438 when the return was completed.
*421 3. David's Estimated Tax Payments for 2012
The parties' 2012 income tax returns are not part of the appellate record. However, information about their estimated tax payments for the 2012 tax year is available. Their accountant's April 16, 2012, letter recommended making federal quarterly estimated tax payments of $40,000 each. The payments for the first and second quarter were made in April and June 2012 from the parties' joint checking account using checks numbered 5322 and 5464.
The accountant also recommended making quarterly estimated tax payments to California's Franchise Tax Board of $24,000, $32,000, $0 and $24,000 ($80,000 total). The parties made the first two payments to the Franchise Tax Board using electronic transfers from their joint checking account.
4. David's 2013 Federal Tax Payments and Refund
A redacted excerpt from David's 2013 federal income tax return shows he had federal withholdings of $8,374 and made estimated tax payments of $140,000. David's total payments of $148,374 exceeded his total federal income tax liability by $38,491. David requested a refund of $38,478 and applied the other $13 to pay an estimated tax penalty. We note David's 2013 tax return had not been prepared when the trial court ordered temporary child support in October 2013 and, therefore, the information in that return about the overpayment of federal income taxes and the related refund was not available to the court at that time.
5. Federal and State Tax Payments and Refunds-2014 and 2015
David's 2014 federal and California income tax returns are part of the appellate record. His total income on his federal return was $681,726, of which $84,236 was wages and $588,289 was his reportable S corporation income. David's total federal tax liability was $174,412. He had withholdings of $9,256 and made estimated tax payments of $240,000. These payments exceeded his federal income tax liability by $74,844, of which $74,804 was refunded to David and $40 was applied to an estimated tax penalty.
David's California income tax return for 2014 showed his state income tax payments totaled $123,214 and exceeded his tax liability by $19,454. David requested the overpayment of $19,454 be refunded to him.
Accordingly, David's federal and state refunds for 2014 totaled $94,258 ($74,804 plus $19,454). To place this figure in context, it equaled 112 percent of the wages David reported on line 7 of his federal income tax return and almost 14 percent of the total income he reported on line 22. Stated from a cash flow perspective, David's total tax refunds for 2014 exceeded the net amount of his paychecks for the year.
When the bench trial was held in October 2015, the 2015 tax year had not yet closed and David's tax returns for 2015 were not available. Therefore, the parties and court could not determine the amounts of state and federal income taxes actually paid for 2015 as a matter of historical fact. In contrast, final information for 2014 was available and was presented to the court. Therefore, the court could have determined the amount of state and federal income tax liability actually paid for 2014 and the amount of the 2014 refunds received in 2015.
6. Ownership of the Tax Refunds
David has relied on his argument that the issues arising from the child support *422 award in the June 2016 judgment are moot and has not specifically addressed Launa's argument that his tax refunds are part of his net disposable income for purposes of section 4059. However, David has presented an argument about ownership of the tax refunds in responding to Launa's arguments about spousal support. Accordingly, we will consider David's argument about the ownership of the tax refunds in our analysis of the child support award contained in the June 2016 judgment.
David contends his federal income tax refund of $74,804 for the 2014 tax year should not be considered part of his income available for spousal support because it belongs to Huddleston Crane and, thus, is not available to him.
First, we conclude David's argument that one or both S corporations own the tax refunds is not supported by direct evidence. There is no direct evidence that David actually transferred the refunds to either S corporation. In addition, there is no evidence of a contractual or other obligation requiring David to transfer the refund to either S corporation. For example, nothing in the corporate bylaws or articles of incorporation impose such an obligation on David.
Second, we conclude the circumstantial evidence is insufficient to support the inference that David transferred the refund to the S corporations or was obligated to make such a transfer. David acknowledges that he testified he received the federal tax refund, but notes that (1) Launa's attorney did not ask him if he returned the tax refund to the company and (2) his accountant's 2013 testimony established that the corporation was paying the taxes for David. The accountant's testimony resulted from a question about whether the accountant knew, based on his records, how much David "has historically been paid in cash flow." The accountant replied:
"Historically, as a general rule, normally-the business philosophy of Huddleston Crane is to take amounts out of the company sufficient to pay the income taxes reported on their individual income tax returns. So specifically the account amount of 2011-I don't have a financial statement sitting in front of me-I couldn't tell you what that number is."
This vague testimony does not address the subject of income tax refunds. David also cited testimony in which Noerr stated he made the decisions as to how much money the company distributed to the owners and he had denied requests by David to distribute additional money.
We have reviewed the accountant's testimony, Noerr's testimony and the other evidence cited by David. In addition, we have considered the inferences that might be drawn from how David and Launa dealt with prior income tax refunds. In particular, the record shows how the $17,905 refund received in 2011 as a result of the overpayment of the federal income taxes for the 2010 tax year was handled. Also, a February 11, 2014, letter from David's attorney to a certified public accountant states various back-up documentation was enclosed, including a copy of "a United States Treasury refund check in the amount of $17,905 reflecting an overpayment of income taxes, as well as a copy of the deposit slip depositing the money into the parties' joint United Security Bank account." A copy of the letter's enclosures is not part of the appellate record, but a schedule of deposits made into the United Security Bank account during 2011 confirms the $17,905 refund was deposited on May 3, 2011. We have reviewed the monthly bank statements for 2011 and have located no evidence showing the refund amount was transferred to one of the S corporations. The bank statements show *423 the federal ($20,000) and California ($16,556) estimated tax payments were made by checks and were covered by a deposit of $36,556 made on June 16, 2011. Therefore, the $17,905 refund was not used to partially fund the estimated tax payments made the month after the refund was received.
Based on our review of the record, we conclude the evidence does not reasonably support the inference that the S corporations owned David's income tax refunds or, alternatively, that David returned the tax refunds to the corporations. Noerr's business philosophy of retaining earning and avoiding borrowing is insufficient to provide reasonable support for the inference that David's tax refund belonged to the corporations. Rather, David's claim he did not own the refunds is based on conjecture and speculation[9] and contradicts the treatment of the federal income tax refund received in 2011. Accordingly, we reject David's ownership theory and his implied argument that his tax refunds were not part of his annual net disposable income for purposes of calculating child support.
7. Error in the June 2016 Judgment
The June 2016 judgment continued the child support awarded in October 2013. It follows that the June 2016 child support award could not have reflected (1) the federal income tax refund David received in 2014 due to the overpayment of his 2013 income taxes or (2) the California and federal income tax refunds David received in 2015 due to his overpayment of taxes on his 2014 income. As a result, the June 2016 child support award contains error in its underlying determinations of David's income for purposes of child support. The $94,258 in state and federal income tax refunds David received in 2015 was money actually available for child support[10] and its exclusion from the trial court's calculation of David's net monthly nontaxable income available for support or from his annual net disposable income for 2015 was error.
On remand, the calculation of David's income for purposes of child support must include the state and federal income tax refunds he received in 2015. If the court calculates David's income for 2014, that calculation must include the tax refunds David received in that year.[11]
F. 2016 Child Support-Contributions to 401(k) Plan
1. Background
Launa contends David's gross monthly income of $9,151 was improperly reduced *424 by his nontaxable, voluntary contributions to the 401(k) plan. Launa (1) interprets the trial court's written decision as stating David's contributions to the 401(k) plan were income available for support and (2) contends the court acted contrary to its statement when it failed to include the contributions in calculating David's net monthly after-tax income as $5,001. Launa's contention is based on the following statement in the October 2013 order's discussion of child support: "The court notes that the determination of income available for support also includes the 401(k) deduction that is made from [David's] check each month." Launa interprets this statement as an expression of the court's intention to include David's contributions to the 401(k) plan in his income available for temporary child support. Launa contends the court's DissoMaster calculations failed to implement this intent because it factually did not include the contribution as part of David's income available for support. Launa contends the error was repeated in 2016 when the court continued the child support it ordered in 2013.
2. Voluntary Contributions as Disposable Income
We conclude that, as a general rule, voluntary contributions to a 401(k) plan are properly included in net disposable income for purposes of calculating child support. (See §§ 4058 [annual gross income], 4059, subd. (c) [deduction of contributions to retirement benefits if required as a condition of employment].) Those contributions, because they are voluntary, represent funds available to the contributing parent to spend as he or she desires. ( Halpert & Leonard (1998) 157 Ore. App. 276, 279, 970 P.2d 253, 254.) When a trial court excludes voluntary contributions to a 401(k) plan from the calculation of a parent's net disposable income, a rationale for deviating from the general rule should be set forth in the record. (§ 4056.)
In the procedural context presented by this appeal, we need not discuss Launa's interpretation of the October 2013 order. It is sufficient for our analysis that the record shows David's contributions to the 401(k) plan were not included in the October 2013 or June 2016 calculation of his net disposable income available for child support and the trial court did not explain the exclusion of the contributions. Accordingly, on remand when the trial court is addressing the other errors in the child support award in the 2016 judgment, the court also shall include the 401(k) plan contributions in calculating David's income available for child support or, alternatively, provide findings that justify the exclusion of all or part of those contributions. We note those contributions do not qualify for the mandatory deduction set forth in subdivision (c) of section 4059, which relates to retirement contributions that are required as a condition of employment. The record contains no evidence David's employment was conditioned on his participation in the 401(k) plan.
G.-I.†
III. SPOUSAL SUPPORT††
IV. ATTORNEY FEES
A. Statutory Provisions
Chapter 3.5 of part 1 of division 6 of the Family Code contains sections 2030 through 2034, which govern the award of attorney fees in marriage dissolution proceedings. Sections 2030 and 2032 contain the statutory text applicable Launa's *425 claims that the trial court erred in denying her request for additional attorney fees.
1. Historical Overview
The history of section 2030 and its predecessors has been described in published decisions and will not be repeated in detail here. The Second District traced the lineage of section 2030 back through its immediate predecessor, former Civil Code section 4370, to former Civil Code section 137, which was enacted in 1872. ( In re Marriage of Hobdy (2004) 123 Cal.App.4th 360, 368-369, 20 Cal.Rptr.3d 104.) Section 2030 was enacted in 1993 and did not make substantive changes to former Civil Code section 4370. ( In re Marriage of Hodby , supra, at p. 369, 20 Cal.Rptr.3d 104 ; see Stats. 1993, ch. 219, § 106.1, pp. 1607-1608.)
As a general principle, when new legislation amends statutory text by substituting the word "shall" for "may," the new legislation has restricted the discretionary authority previously granted under the statute. (See § 12 [" 'Shall' is mandatory and 'may' is permissive"].) The version of section 2030 enacted in 1993 stated the trial court "may ... order" attorney fees in certain circumstances. (Stats. 1993, ch. 219, § 106.1, pp. 1607-1608.) The 2004 amendment deleted the word "may" and inserted text that used the word "shall" four times. (Stats. 2004, ch. 472, § 1, p. 3057.) The 2010 amendment modified section 2030 to include text stating "the court shall make findings" and stating "the court shall make an order awarding attorney fees and costs" if the findings demonstrated certain conditions. (Stats. 2010, ch. 352, § 4, p. 1819.) The textual changes made by the 2004 and 2010 legislation demonstrate that the discretionary authority granted to trial courts is not as broad as it once was and, currently, trial courts must comply with certain mandatory provisions. (See Kevin Q. v. Lauren W. , supra , 195 Cal.App.4th at pp. 639-640, 124 Cal.Rptr.3d 676 [2004 amendment restricted trial court's discretion].)
Accordingly, we conclude the "broad discretion" referred to in judicial decisions discussing the version of 2030 predating the 2004 and 2010 amendments no longer exists. (See e.g., Cheriton , supra , 92 Cal.App.4th at p. 314, 111 Cal.Rptr.2d 755 ["trial courts enjoy broad discretion in awarding attorneys' fees in marital proceedings"].) The Legislature has imposed limitations on that discretion and it is no longer accurate to refer to a trial court's "broad discretion" when describing a trial court's responsibilities under section 2030 as currently in effect.
2. Statutory Text
The current version of subdivision (a) of section 2030 provides:
"(1) In a proceeding for dissolution of marriage, ... and in any proceeding subsequent to entry of a related judgment, the court shall ensure that each party has access to legal representation, including access early in the proceedings, to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party, except a governmental entity, to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding.
"(2) When a request for attorney's fees and costs is made, the court shall make findings on whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If *426 the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs. A party who lacks the financial ability to hire an attorney may request, as an in pro per litigant, that the court order the other party, if that other party has the financial ability, to pay a reasonable amount to allow the unrepresented party to retain an attorney in a timely manner before proceedings in the matter go forward." (Italics added.)
The word "shall" in this subdivision has been italicized to emphasize the mandatory nature of the provision. The first two sentences of section 2030, subdivision (a)(2) were enacted in 2010 as part of Assembly Bill No. 939 (2009-2010 Reg. Sess.), which became effective on January 1, 2011. (See Stats. 2010, ch. 352, § 4, p. 1819; In re Marriage of Cryer (2011) 198 Cal.App.4th 1039, 1055, fn. 4, 131 Cal.Rptr.3d 424 ; Cal. Const., art. IV, § 8, subd. (c)(1) [effective date of statute].) When considering an application for attorney fees, the trial court must comply with the mandatory provisions of the statute because discretionary authority "must be exercised within the confines of the applicable legal principles." ( Sargon Enterprises, Inc. v. University of Southern California (2012) 55 Cal.4th 747, 773, 149 Cal.Rptr.3d 614, 288 P.3d 1237.)
3. Interpreting the Text-Findings Must Be Explicit
The first question of statutory interpretation we consider involves the language stating "the court shall make findings" on three specific questions and whether the findings must be explicit (i.e., written or oral) or, alternatively, may be implicit. We conclude the findings must be explicit.
Our Supreme Court interpreted language in former Civil Code section 4600, a provision in the Family Law Act relating to an award of custody of a child to a nonparent. The provision stated the court " 'must make a finding that an award of custody to a parent would be detrimental to the child.' " ( In re B.G. (1974) 11 Cal.3d 679, 695, 114 Cal.Rptr. 444, 523 P.2d 244.) Our Supreme Court determined this statutory text required an express finding. ( Id . at p. 683, 114 Cal.Rptr. 444, 523 P.2d 244.) The phrase "shall make findings" is similar to the phrase "must make a finding" because "shall" and "must" are routinely construed as mandatory. ( Jones v. Catholic Healthcare West (2007) 147 Cal.App.4th 300, 307, 54 Cal.Rptr.3d 148.) Therefore, we conclude the phrase "the court shall make findings" requires the court to make express findings-that is, findings stated in words, either in writing or orally on the record. ( § 2030, subd. (a)(2).)
The next legal question presented is whether the failure to make explicit findings on the three questions set forth in the statute warrants automatic reversal or, alternatively, whether the appellant must establish the error was prejudicial. We conclude California's constitutional doctrine of reversible error applies and requires the appellant to establish prejudice. ( Cal. Const., art. VI, § 13.) An appellant in a civil case establishes an error was prejudicial by showing there is "a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached." ( Soule v. General Motors Corp. (1994) 8 Cal.4th 548, 574, 34 Cal.Rptr.2d 607, 882 P.2d 298.)
B. The Trial Court's Denial of Additional Fees
The trial court's October 2013 order granted Launa a pendente lite award of attorney fees in the amount of $15,000. The order stated the award was without *427 prejudice to future requests by Launa for additional attorney fees.
After the October 2015 trial, Launa's lawyer submitted a declaration requesting additional attorney fees of approximately $115,000. In addressing this request, the trial court's April 2014 proposed statement of decision identified sections 2030 and 2032 as the statutory basis for an award of attorney fees and quoted In re Marriage of Sharples (2014) 223 Cal.App.4th 160, 166 Cal.Rptr.3d 818 and Alan S. v. Superior Court (2009) 172 Cal.App.4th 238, 91 Cal.Rptr.3d 241 -judicial decisions that discussed those sections and other principles. The court stated: "While the court has discretion in fashioning an attorney fee award, its decision must reflect an exercise of discretion and a consideration of the appropriate factors as set forth in sections 2030 and 2032." The trial court supported this statement by citing Alan S. , a case decided before the 2010 amendment added the following sentence to section 2030, subdivision (a)(2) : "If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs." (Italics added.) The trial court's description of applicable legal principles did not quote or summarize this mandatory sentence or the following language from subdivision (b) of section 2032 : "The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested."
The court's written decision then noted the total amount of Launa's request for attorney fees, the fact $15,000 had previously been awarded to her, and stated her net request sought an additional $115,134.65 in attorney fees. The court analyzed her request by stating:
"In evaluating the relative financial circumstances of the parties, the Court notes that both parties obtained a significant amount of money from the sale of the family residence, each receiving approximately $300,000. Both parties also received a significant distribution of funds from the parties' 401k plan. Under the circumstances, there is no demonstrated need for an order that [David] pay for her attorney's fees. Both parties have sufficient resources to pay for their own attorney's fees and costs."[17]
Details about the assets Launa received from the division of community property are contained in the March 2016 judgment of reserved issues. It stated Launa would receive (1) one-half of the remaining net proceeds generated by the sale of the family residence, which proceeds totaled approximately $295,084; (2) one-half of the 401(k) plan, which had a balance of approximately $285,150 as of July 31, 2012; and (3) one-half of a brokerage account that had a balance of approximately $245,688 as of June 30, 2015. One-half of these figures is approximately $413,000. When added to the $150,000 of proceeds from the sale of the residence previously distributed, Launa's share of those assets totaled approximately $563,000.
C. Claims of Error
Launa contends the trial court erred in awarding her no attorney fees beyond the $15,000 pendente lite award. First, Launa contends the court failed to consider her needs when it denied her request. Second, she contends "the Court failed to exercise its discretion to make both a need and ability to pay analysis" because it did not *428 properly include an evaluation of David's ability to pay. We need not discuss her first contention in detail because of our resolution of the second.
1. Improper Analysis-Disparity and Ability to Pay
Launa argues the trial court did not exercise its discretion properly, which requires an analysis of both the needs of the parties and their ability to pay. In her view, "[t]he Court should have analyzed the great disparity in the parties' incomes." Launa's reply asserts "[t]here is an obvious disparity between the parties' incomes."
Launa's references to the disparity in incomes and in other financial circumstances invokes the text of section 2030, subdivision (a)(2) that uses the term "disparity." That provision specifically states a trial court must make a finding on "whether there is a disparity in access to funds to retain counsel." The common and ordinary meaning of the word "disparity" is "[i]nequality; a difference in quantity or quality between two or more things." (Black's Law Dict., supra, at p. 504.) Here, the trial court's proposed statement of decision and its June 2016 judgment failed to include the statutorily mandated finding. Consequently, the court's decision failed to comply with a mandatory provision of the statute.
Launa also argues the trial court failed to make an ability-to-pay analysis, which is related to another question for which an explicit finding is required. Under section 2030, subdivision (a)(2), the trial court was required to make a finding on "whether [David] is able to pay for legal representation of both parties." The trial court's decision did not include this mandatory finding. Consequently, the court committed legal error by failing to comply with two mandatory provisions of section 2030, subdivision (a)(2).
2. Appellate Relief
Next, we consider the consequences of the failure to make the mandatory findings and how that affects the appellate relief granted by this court. (See Code Civ. Proc., §§ 43, 906.) One possibility is to remand with directions for the trial court to make those findings. Another possibility is to conclude the evidence in the record establishes the facts that render an award of attorney fees mandatory and, as a result, limit the further proceedings on remand to a determination of the amount of those additional attorney fees. Based on our review of the record, we conclude an award of attorney fees was mandatory and the amount of the award should be among the issues decided on remand.
Pursuant to section 2030, subdivision (a)(2), if the mandatory "findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs." Here, the record demonstrates "a disparity in access to funds to retain counsel." Both parties have access to the funds resulting from the division of the community assets. However, David has access to the funds generated by (1) his employment and (2) his ownership of one-half of Huddleston Crane Services, Inc. and H.C.S. Mechanical, Inc. Specifically, he receives a weekly paycheck, net rental income of $7,650 per month, and other funds from the corporations, including funds to make quarterly estimated income tax payments that sometimes result in significant refunds. In particular, the most recent income tax refunds shown in the record establish that in 2015 David received federal and state refunds totaling $94,258 ($74,804 plus $19,454). In contrast, Launa's access to funds is limited to the funds obtained from the division of *429 the community assets. Her income from employment was minimal before she stopped working as a courier and his does not own a revenue generating business. Accordingly, the record compels a finding of a disparity in access to funds for retaining and paying counsel.
In addition, the record demonstrates David "is able to pay for legal representation of both parties" and there is a disparity in the ability to pay for legal representation. ( § 2030, subd. (a)(2).) The disparity in the ability to pay for legal representation is established by the disparity in the parties' wages and salaries and Launa's lack of rental income or other business income. The fact that Launa holds assets from the division of community property that are sufficient to cover her attorney fees does not negate the existence of the significant disparity in the ability to pay for legal representation. (See § 2032, subd. (b).) The long-term financial consequences of requiring Launa to liquidate those assets to pay for attorney fees-assets which, in contrast to David, she does not have the means to replenish-must be evaluated in determining the ability to pay.
Accordingly, if the trial court has explicitly found an insignificant "disparity in access and ability to pay" ( § 2030, subd. (a)(2) ), that finding would have to be overturned for lack of sufficient evidentiary support. Consequently, no purpose would be served by remanding to the trial court with instructions to make explicit findings on the three issues listed in subdivision (a)(2) of section 2030. The record compels findings that make the award of attorney fees mandatory. Accordingly, we remand for the trial court to determine the amount of those fees in the first instance.
D. Attorney Fees on and after Appeal
Subdivision (c) of section 2030 states the trial court "shall augment or modify the original award for attorney's fees and costs as may be reasonably necessary for the prosecution ... of the proceeding, or any proceeding related thereto, including after any appeal has been concluded." Launa's appeal was reasonably necessary for the prosecution of the proceeding, but the amount reasonably necessary for her pursuit of this appeal and the further proceedings on remand is a matter to be resolved by the trial court in the first instance. (See In re Marriage of Schofield (1998) 62 Cal.App.4th 131, 140-141, 73 Cal.Rptr.2d 1.)
DISPOSITION
The judgment is affirmed as to the characterization of David's ownership interest in the family business as his separate property and is reversed and vacated as to (1) child support, (2) spousal support, and (3) attorney fees. The matter is remanded to the trial court for further proceedings not inconsistent with this opinion.
Launa Morton shall recover her costs on appeal.
WE CONCUR:
DETJEN, Acting P.J.
SMITH, J.

All unlabeled statutory references are to the Family Code.

Noerr married Tammy Morton, the daughter of Father and sister of David. Thus, Noerr was Father's son-in-law and is David's brother-in-law.

An S corporation, like a partnership, does not pay income taxes. (Heller v. Franchise Tax Bd. (1994) 21 Cal.App.4th 1730, 1733, 27 Cal.Rptr.2d 88 [tax treatment of S corporations]; Valentino v. Franchise Tax Bd. (2001) 87 Cal.App.4th 1284, 1287, 105 Cal.Rptr.2d 304.) Instead, its income and losses are " 'passed through' " on a pro rata basis to its shareholders, who report those items on their personal tax returns. (Heller , supra , at p. 1733, 27 Cal.Rptr.2d 88.)

David's November 2012 declaration described Huddleston Crane as two companies-Huddleston Crane Services, Inc., the operating company, and H.C.S. Mechanical, Inc., which owns equipment used by the operating company.

At times, it appears the trial court accepted this description. For instance, its August 31, 2015, ruling stated: "The sole issue before the Court is the characterization of Huddleston Crane Services, Inc. and its wholly owned subsidiary, HCS Mechanical, Inc. as community property or as David's separate property." In contrast, the court's March 2016 judgment uses less specific language to describe the relationship of the two corporations. It refers to David's 50 percent ownership interest "in Huddleston Crane Services, Incorporated, and its related entities, specifically including, HCS Mechanical, Incorporated." These documents and the other evidence in the record establish that H.C.S. Mechanical, Inc. is not a subsidiary (wholly owned or otherwise) of Huddleston Crane Services, Inc. Instead, both corporate entities are owned by David and Noerr, each owning 50 percent of each corporation's outstanding shares. There is no evidence in the record indicating the source of H.C.S. Mechanical's capital.

David's 2014 federal income tax returns show a $250,000 expense deduction pursuant to Internal Revenue Code section 179 (26 U.S.C. § 179 ). The deduction related to the nonpassive income of Huddleston Crane Services, Inc. That tax provision authorizes a taxpayer to elect to treat the cost of acquiring certain business assets as a cost (i.e., a current deduction) rather than depreciating that cost over the life of the asset. (See 26 C.F.R. §§ 1.179-1 to 1.179-6.) Thus, the tax deduction taken by David implies that Huddleston Crane Services, Inc. purchased depreciable assets in 2014 costing over $250,000. Tax returns filed by the parties before their separation show section 179 deductions of $103,332 (2008), $90,099 (2009), $250,000 (2010), and $14,500 (2011).

Where one spouse has exclusive use of a community asset during the period between separation and trial, that spouse may be required to compensate the community for the reasonable value of its use. (In re Marriage of Falcone & Fyke (2012) 203 Cal.App.4th 964, 978, 138 Cal.Rptr.3d 44.) This compensation is commonly referred to as a " 'Watts charge.' " (Ibid . ; see In re Marriage of Watts (1985) 171 Cal.App.3d 366, 374, 217 Cal.Rptr. 301 (Watts ).)

See footnote *, ante .

The terms "interim," "pendente lite" and "temporary" are used interchangeably in describing temporary support orders. (In re Marriage of Gruen (2011) 191 Cal.App.4th 627, 639, 120 Cal.Rptr.3d 184.)

See footnote *, ante .

Based on the record before this court, it appears any payment of federal and state estimated tax payments by the S corporations on behalf of David and Noerr would have reduced the capital account of the owner who benefited. Conversely, if David or Noerr had returned a tax refund to the S corporations, that infusion of money into the corporation probably would have been accounted for as a contribution to capital with a corresponding increase in that owner's capital account. Financial records reflecting changes to the owners' capital accounts in the S corporations are not part of the appellate record.

The fact that federal law authorizes local child support agencies to enforce child support orders by intercepting federal income tax refunds (42 U.S.C. § 664 ) demonstrates that income tax refunds are available to pay child support.

We note the exclusion of the tax refunds from these years is not justified by the possibility that income tax refunds might not be received in subsequent years. For purposes of David's child support obligation, which ended on June 1, 2016, what might occur in subsequent years is of little practical significance to the funds available to David to pay child support until June 1, 2016. In comparison, David's receipt of refunds in 2014 and 2015 prior to the termination date affected the amount of funds available to him to pay child support through the termination date.

See footnote *, ante .

See footnote *, ante .

The attachment to the June 2016 judgment contained essentially the same discussion of the attorney fees request as the proposed statement of decision.