Filed 6/3/21  Marriage of Karney and Schulman CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re the Marriage of BENJAMIN KARNEY and JESSICA SCHULMAN. | B303544 |
| BENJAMIN KARNEY, | Los Angeles County Super. Ct. No. PD054120 |
| Respondent, | |
| v. | **Order Modifying Opinion** |
| JESSICA SCHULMAN, | [No change in judgment] |
| Appellant. | |

BY THE COURT:*

It is ordered that the opinion filed May 14, 2021 is modified as set forth below. There is no change in the judgment.

1.  On page 26, delete the fourth sentence of the disposition in its entirety.

2.  On page 26, modify the second sentence of the disposition to read: "The December 31, 2019 order is

reversed to the extent it modifies support for any period prior to March 15, 2019 and the matter is remanded with instructions to the trial court to modify the December 31, 2019 order's Attachment to Findings and Order after Hearing in a manner consistent with this opinion."

*LAVIN, Acting P. J.    EGERTON, J.    KALRA, J.*1

---

*1 Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 5/14/21  Marriage of Karney and Schulman CA2/3 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re the Marriage of BENJAMIN KARNEY and JESSICA SCHULMAN. | B303544 |
| BENJAMIN KARNEY, | Los Angeles County Super. Ct. No. PD054120 |
| Respondent, | |
| v. | |
| JESSICA SCHULMAN, | |
| Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, Dianna Gould-Saltman, Judge. Affirmed in part; reversed in part; remanded with directions.

Law Offices of William W. Oxley, William W. Oxley; Jeff Lewis Law, Jeffrey Lewis and Sean C. Rotstan for Appellant.

Ribet & Silver and Claudia Ribet for Respondent.

# INTRODUCTION

This is an appeal from two postjudgment orders in a marital dissolution case. The orders relate to child support, spousal support, supplemental support based on income, adult child support, and the custody schedule.

Appellant Jessica Schulman (Schulman) and respondent Benjamin Karney (Karney) were married for 14 years and have two children together, one of whom (Daniella) has several medical conditions that substantially impact her life. For that reason, the parties' Marital Settlement Agreement (Agreement) provided for ongoing court jurisdiction regarding the duty to provide adult child support for her under Family Code[2] section 3910—a statute that obligates parents to support their adult children if the children are "incapacitated from work" and without financial means of self-support. The trial court declined to require adult support because Daniella, who began taking college-level courses at the age of 12 and had already earned an associates degree before she turned 18, is not incapacitated from work within the meaning of the statute. Schulman contends the court erred in so ordering.

In addition, Schulman argues the court incorrectly based its support calculations on Karney's income as reported on his tax returns and as stipulated by the parties, improperly excluded tax refunds and monetary gifts from Karney's income for purposes of calculating supplemental support, and erroneously provided Karney additional custodial time with the parties' son. All of Schulman's arguments are unpersuasive. We agree with the

---

[2] All undesignated statutory references are to the Family Code.

parties, however, that the court erred in adjusting child support retroactively, which is not permitted under section 3651, subdivision (c)(1). Accordingly, we reverse the court's orders to the extent they provide for any retroactive support adjustments. We affirm in all other respects.

## FACTS AND PROCEDURAL BACKGROUND

### 1.     The Parties and the Status Quo Ante

Schulman and Karney married in 1998 and have two children: Daniella and Gabriel. When she was very young, Daniella developed several serious medical conditions including a serious immune disorder (common variable immunodeficiency), fibromyalgia, scoliosis, and severe, chronic pain. When it became evident that Daniella had special medical needs, Schulman stopped working outside the home and spent most of her time raising the children. Karney has a Ph.D. from and is a professor at University of California, Los Angeles.

The couple's divorce became final in 2013. Karney and Schulman resolved custody, support, and property issues through the Agreement. In general terms, and as pertinent here, the Agreement provided that the parties had joint legal custody and Schulman had primary physical custody of both children. Karney was required to pay Schulman $4,200 per month for base child support and, as additional child support, 10 percent of any income over and above his regular salary.[3] Karney also agreed to

---

[3] We refer to the Agreement's support provisions relating to Karney's income over and above his regular salary as the "Ostler-Smith provision."

pay Schulman $4,200 per month for base spousal support and 23 percent of any income over and above his regular salary. The Agreement provided, in addition, that "[w]ith respect to Daniella, the parties acknowledge that Daniella has special medical needs and will be incapacitated from earning a living and without sufficient means at the time she will reach majority and the parental duty to support her shall extend beyond the age of majority. As such, the Court shall reserve jurisdiction over the duty to support Daniella beyond the age of majority pursuant to Family Code Section 3910 and *Marriage of Drake* and [Karney]'s obligation to pay support for Daniella shall continue until further order of the Court."[4]

In 2014, and at Karney's request, the court reduced his base support obligations to $3,402 per month for child support[5] and $3,500 per month for spousal support because his income had decreased. The court left the Ostler-Smith provision in force.

## 2. The 2019 Proceedings

### 2.1. Karney's Request for Order

Karney filed a Request for Order (RFO) on March 15, 2019. Karney sought to reduce his base monthly child support for Gabriel from $2,126 to $1,684 and for Daniella from $1,276 to $980, effective April 1, 2019. Karney also proposed that the court reduce the Ostler-Smith provision relating to child support from 10 percent to 5 percent following Daniella's 18th birthday.

---

[4] We will refer to this provision as the "adult support provision."

[5] The court allocated this amount as $1,276 for Daniella and $2,126 for Gabriel.

In addition, Karney requested that the court reduce his base spousal support obligation to $0 and eliminate the Ostler-Smith provision relating to spousal support. Karney represented that Schulman had been working for the past several years, unbeknownst to him, and asked that the court recalculate both base support figures and adjust the Ostler-Smith provision to reflect her income.

Finally, as pertinent here, Karney asked the court to eliminate the adult support provision, which would be triggered in October 2019 when Daniella turned 18. According to Karney, Daniella had progressed well beyond the parties' expectations when they signed the Agreement and she was not incapacitated for work within the meaning of section 3910. Karney also requested minor modification of the existing custody schedule for Gabriel.[6]

### 2.2. Schulman's Request for Order

Approximately two weeks after Karney filed his RFO, Schulman filed her own RFO. Schulman asserted that Karney had not fully honored his support and other financial obligations as provided in the Agreement. Schulman initially contended that Karney owed child and spousal support arrears of nearly $28,000 and owed additional monies under the Ostler-Smith provision.

### 2.3. The Parties' Pre-trial Stipulations

The court consolidated the two RFOs for hearing.

---

[6] At the time Karney filed his RFO, Daniella was not spending any custodial time with Karney at her request.

In lieu of live testimony, Daniella submitted a declaration describing her educational achievements, her medical conditions and their impact on her life, her daily and occasional activities, and her future goals. Schulman had also submitted a declaration providing some details about Daniella's medical conditions and her ability to attend school and participate in other activities. The parties stipulated to the admission of these declarations prior to trial.

The parties resolved several issues set forth in the RFOs before the trial began. As relevant here, Schulman stipulated that Karney had paid her "all amounts due and owing by and for child and spousal support on his royalties received and speaking engagements for which he has been compensated and there are no arrears due or owing … for child or spousal support on his income received since the entry of the [Agreement]." The parties also agreed on their income and relevant additions and deductions for purposes of calculating child support beginning April 1, 2019.

The parties identified the issues to be resolved at trial. Those issues included:

- Whether any nontaxable income received by Karney should be used in calculating base child support;

- Whether the Ostler-Smith provision would be eliminated or adjusted for purposes of child support and spousal support after April 1, 2019;

- Whether the Ostler-Smith provision should be applied to monetary gifts Karney received from his family and/or tax refunds;

6

- Whether child support should be retroactively modified to reflect Schulman's income from 2015 to the present;

- Calculation of base child support due after April 1, 2019;

- Calculation of base child support due after Daniella's 18th birthday; and

- Whether and to what extent Karney would pay Schulman base spousal support after April 1, 2019.

### 2.4. Trial

The court conducted a two-day trial in July 2019. The court heard testimony from Karney and Schulman, as well as a babysitter who had worked for the family since Daniella was three or four years old. The parties also stipulated to the admission of certain evidence, including the moving and responsive pleadings. At the conclusion of the proceedings, the court gave its ruling from the bench The court also issued a detailed minute order containing its findings. Two subsequent hearings took place in order to clarify portions of the court's ruling.

### 3. The Court's Orders and Appeals

On December 26, 2019, the court entered an order resolving the custody schedule issues relating to Gabriel. Schulman filed a timely notice of appeal.

On December 31, 2019, the court entered a further order resolving all the remaining issues presented in the parties' RFOs. With respect to adult child support for Daniella, the court found

"[t]here is evidence that she has the need for medical accommodations but there is no medical evidence that she is unable to earn a living or that her stipulated medical conditions are anticipated to prevent her from ever being able to work." The court concluded that Daniella was not "incapacitated from earning a living" as required by section 3910 and, accordingly, that Karney's child support obligation ended on Daniella's 18th birthday.

After setting forth the parties' stipulations and the court's findings relating to child support, the court modified child support in several respects. First, for the period January 1, 2015 through December 31, 2018, the court retroactively modified base child support to reflect Schulman's previously unaccounted-for income, resulting in a substantial reimbursement amount owing from Schulman to Karney. Second, for the period April 1, 2019 to September 30, 2019, the court ordered Karney to pay base support of $3,510 per month allocated as $2,016 to Gabriel and $1,494 to Daniella. And third, for the period October 9, 2019 forward, Karney would pay Schulman $2,008 per month in base child support for Gabriel.

The court also reviewed its findings under section 4320 regarding spousal support and reduced base spousal support to $2,000. In addition, the court ordered Schulman to reimburse Karney $6,000 for spousal support overpayments during the pendency of the RFO proceedings.

Finally, the court made several rulings regarding the Ostler-Smith provision. First, as to additional child support, the court eliminated the Ostler-Smith provision and instead attributed an additional $800 in taxable monthly income to Karney. The court left intact the Ostler-Smith provision

8

requiring Karney to pay 23 percent of any income in excess of $17,445 per month to Schulman as additional spousal support. But the court ordered that tax refunds and unearned income (such as occasional monetary gifts from members of Karney's family) were properly excluded from the Ostler-Smith calculations.

Schulman filed a timely notice of appeal from the court's December 31, 2019 order.

## DISCUSSION

With respect to the December 31, 2019 order, Schulman contends the court erred by failing to award adult child support for Daniella, using incorrect income and expense figures in its base child support calculation, and interpreting the Agreement's Ostler-Smith provision to exclude monetary gifts and tax refunds. None of these arguments has merit. We agree with the parties, however, that the court erred in retroactively reducing child support owed between January 1, 2015 and December 31, 2018. As to the December 26, 2019 order, Schulman has failed to present a coherent argument supported by relevant legal authority.

1. **The court did not abuse its discretion by failing to order adult child support for Daniella.**

Schulman contends the court erred by failing to order adult child support for Daniella under section 3910. We disagree.

### 1.1. Standard of Review

We review a family court's decision to award, deny, or modify adult child support for an abuse of discretion. (*In re Marriage of Drake* (2015) 241 Cal.App.4th 934, 939 (*Drake II*).)

9

"In conducting this review, [we] determine whether the trial court's factual findings are supported by substantial evidence and whether the trial court reasonably exercised its discretion—that is, whether any judge reasonably could have made such an order." (*In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1039.) "On review for substantial evidence, we examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference. [Citation.] We accept all evidence favorable to the prevailing party as true and discard contrary evidence. [Citation.]" (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1151 (*Drake I*).)

### 1.2. Legal Principles Regarding Incapacity

Parents have an equal responsibility to maintain a child of any age "who is incapacitated from earning a living and without sufficient means." (§ 3910, subd. (a).) Awarding child support for such adult children protects the public from the burden of supporting people whose parents are able to support them. (*Drake II, supra*, 241 Cal.App.4th at p. 940; *In re Marriage of Cecilia & David W.* (2015) 241 Cal.App.4th 1277, 1286.) Here, as noted, the parties explicitly addressed the issue of adult support for Daniella in the Agreement: "With respect to Daniella, the parties acknowledge that Daniella has special medical needs and will be incapacitated from earning a living and without sufficient means at the time she will reach majority and the parental duty to support her shall extend beyond the age of majority. As such, the Court shall have jurisdiction over the duty to support Daniella beyond the age of majority pursuant to Family Code Section 3910 and Marriage of Drake and [Karney]'s obligation to pay support for Daniella shall continue until further order of the Court."

10

As the parties acknowledge, the term "incapacitated" is not defined and caselaw interpreting that statutory requirement is limited. (See, e.g., *In re Marriage of Cecilia & David W., supra*, 241 Cal.App.4th at p. 1286 ["We recognize there is a dearth of authority applying the incapacity standards, as section 3910 cases are uncommon and generally involve no dispute over capacity."].) Often, the child's incapacity is plain. (See, e.g., *Drake I, supra*, 53 Cal.App.4th at pp. 1139, 1148–1149, 1154 [ordering adult support for child who suffered from progressive schizophrenia that rendered him unable to care for himself and who required assistance from a live-in housekeeper and cook to live independently]; *Drake II, supra*, 241 Cal.App.4th at p. 937 [ordering adult support for 19-year-old diagnosed with attention deficit hyperactivity disorder, psychotic disorder (not otherwise specified), oppositional defiant disorder, and cannabis abuse who had been required to live in a residential treatment center since the age of 14].)

In a closer case, where incapacity is disputed, "[t]he term 'incapacitated from earning a living' [citation] means 'an inability to be self-supporting because of a mental or physical disability or proof of inability to find work because of factors beyond the child's control.' " (*Drake II, supra*, 241 Cal.App.4th at p. 940.) The court's analysis in *In re Marriage of Cecilia & David W.* provides helpful guidance in the present case. Divorced parents Cecilia and David had one child, Robert, who was 24 years old when Cecilia initiated proceedings to compel David to pay adult child support because Robert was " 'not currently capable of earning a living or being self-supporting' and it was 'uncertain he ever will be.' " (*In re Marriage of Cecilia & David W., supra*, 241 Cal.App.4th at p. 1280.) Robert suffered from Tourette's

11

syndrome, attention deficit hyperactivity disorder, learning disabilities, and emotional management issues. Robert's treating psychologist testified that these conditions regularly impacted Robert's life and resulted in a " 'constant struggle' without external support, schedules and feedback to help him self-regulate emotion" and recover from high levels of anxiety and panic attacks. (*Id*. at pp. 1280–1282.)

Notwithstanding those conditions, Robert completed high school on time and attended community college for five years, during which time he earned two associates degrees and achieved a 3.3 grade point average. (*In re Marriage of Cecilia & David W., supra*, 241 Cal.App.4th at p. 1281.) He required accommodations at school, including "intervention by disabled student services, less distracting test settings, extra time for tasks, and tutors" and was admitted to the hospital twice during one semester due to severe panic attacks. (*Ibid*.)

Robert subsequently enrolled at the University of California, San Diego (UCSD) and again required accommodations including disabled student services intervention, quiet test facilities, flexibility for test completion time, use of a laptop and tape recorder in class, and private tutoring. (*In re Marriage of Cecilia & David W., supra*, 241 Cal.App.4th at p. 1281.) He was generally maintaining a B-grade point average. (*Ibid*.) In addition, Robert was living on campus with roommates during the week and with Cecilia on weekends, holidays, and during the summer breaks. (*Ibid*.) Robert had a car and drove himself. He also advocated for himself, with ongoing support from Cecilia. (*Ibid*.) And although Robert had never applied for a job, he believed he would do so after completing school. Both Cecilia

and David believed and hoped that Robert would eventually be able to work. (*Id.* at pp. 1282–1283.)

The trial court, however, was not in agreement. The court found Robert "incapacitated from employment" under section 3910 because he was unable to work and go to school at the same time. The court also found Robert's manner atypical and concluded he would have difficulty finding a job. Specifically, the court concluded " 'the only evidence is that [Robert] could potentially get a minimum wage job, maybe, but that would require ADA accommodations,' which it viewed as speculative." (*In re Marriage of Cecilia & David W., supra*, 241 Cal.App.4th at p. 1283.) In addition, for reasons not pertinent here, the court found Robert was "without sufficient means" under section 3910 and therefore found him to be entitled to adult child support. (*Ibid.*)

The court of appeal reversed the support order. (*In re Marriage of Cecilia & David W., supra*, 241 Cal.App.4th at pp. 1285–1288.) Regarding incapacity, the court of appeal emphasized that courts must not focus solely on the adult child's conditions; they must consider the child's ability to find work or become self-supporting in light of such conditions. (*Id.* at p. 1286.) The medical and anecdotal evidence demonstrated that Robert required accommodations at school and that his medical conditions might pose challenges for him in the workplace, particularly a stressful one. At the same time, however, Robert was able to function independently in many settings and was earning a college degree, living in a dormitory part-time, driving,

13

and seeing his psychologist.[7] (*Id*. at pp. 1287–1288.) Moreover, Robert, his psychologist, and both his parents believed he would be able to work after he completed college. (*Id*. at p. 1288.) The court also noted that the absence of a vocational evaluation made it difficult to establish that Robert was incapacitated from employment due to his medical conditions.[8] (*Ibid*.)

### 1.3. Analysis

Substantial evidence supports the court's finding that Daniella is not incapacitated from employment within the meaning of section 3910.

It was not seriously disputed that Daniella has several medical conditions that substantially impact her daily life and ability to be productive. She receives weekly infusions to manage her immune disorder. She also has a severe form of scoliosis and

---

[7] Citing *In re Marriage of Cecilia and David W.*, *supra*, Schulman asserts that "[f]ocusing on a child's ability to attend and complete school is not a relevant inquiry and can be cause for reversal of an order regarding support of an incapacitated adult." As noted, however, the court of appeal did consider such evidence relevant to the extent it demonstrated Robert's present ability to function outside of his mother's care and supervision using skills that might also be applicable in the workplace.

[8] Schulman also claims the court could not make a finding regarding Daniella's capacity to work without a vocational evaluation. In the same vein, she urges that Karney's testimony and the court's conclusions were speculative because they were not based on a vocational evaluation. Neither *In re Marriage of Cecilia and David W.*, *supra*, 241 Cal.App.4th at p. 1288 nor *In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1054, *requires* a vocational evaluation, as Schulman asserts.

wears a back brace which is uncomfortable. She may ultimately need surgery to correct the spinal curvature. In addition, Daniella has been diagnosed with fibromyalgia, a condition that causes her chronic pain and fatigue—both of which require her to take frequent breaks during the day to rest. Daniella says that it is difficult for her to concentrate due to the pain and fatigue she experiences and, as a result, she sometimes has difficulty completing school assignments quickly.

When Daniella was young, she was home-schooled due to her medical needs. Daniella is extremely intelligent, however, and began taking college level courses at a local community college at the age of 12. Before she turned 18 years old, she had graduated from high school and earned an associates degree in History. She earned mostly A, and some B, grades during that time.

Although Daniella is unable to attend school full time due to fatigue, chronic pain, and other aspects of her medical conditions, at the time of trial, she was able to take two in-person classes and one online class each quarter while maintaining top grades. At that time, she planned to continue her studies and earn a bachelor's degree, but believed it would take her substantially longer than the typical four to five years. Daniella believes, however, that she cannot work or attend school full time due to her disabilities.

Daniella is able to participate in many activities with her family and her peer group. For example, Daniella travelled with Karney to Israel and New York City and travelled with Schulman to Florida and Hawaii. She has also attended sleep-away camp without either parent. Daniella occasionally babysits her younger brother. Schulman noted that Daniella "has a meaningful life.

She is socially connected, independent in thought, and she is a member of several clubs." Although Daniella does not drive yet, she often travels independently to school using a rideshare service. And at the time of the trial, Daniella hoped to get a driver's license "soon."

Daniella has some physical limitations and sometimes needs assistance from "walking sticks" to walk. And Daniella attested that she is only able to stand for a total of one hour per day and can, in addition, walk slowly and in short spurts for less than one hour per day. Although some physical activities such as snorkeling are possible, other activities, such as hiking, waterskiing, and horseback riding, are too painful and exhausting for her to undertake.

Daniella sees herself, as her parents do, as exceptionally creative and artistic. She makes clay figurines and near the time of trial was working on an animated story with lessons she learned in her Hebrew class. She hopes to put those skills to use as an animator after she graduates from college.

In sum, Daniella was, at the time of trial, an impressive young woman with many talents and skills, who was precocious in school, and who was unfortunately burdened with serious medical issues that significantly restricted her ability to be as active and agile as a typical teenager. And although Daniella receives accommodations at school and requires some assistance from her mother as well as a reduced workload, nothing in the record suggests that she is, or is likely to become, incapacitated from working within the meaning of section 3910. That she may in the future require workplace accommodations relating to her medical and physical needs does not categorically render her incapacitated from working, as Schulman seems to imply. And

insofar as Daniella continues to pursue her college education, the Agreement provides for the payment of her tuition, housing, and related expenses.[9]

Although Schulman acknowledges that we review the court's ruling for substantial evidence and that we construe the evidence in the light most favorable to the judgment, she fails to apply those principles. Schulman urges, for example, that although Karney's testimony supports the court's ruling, his testimony was "outdated" because Daniella had not lived with Karney for several months prior to trial. She also claims Karney's testimony was "speculative" in comparison to the medical evidence summarized in her own declaration. She then recites in detail the evidence she presented in support of her contention that Daniella is incapacitated from employment. But the question before us is not whether the record contains evidence that would support a ruling contrary to the court's decision. Rather, our power "begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support" the trial court's findings. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874, italics omitted.) We do not determine credibility or reweigh the evidence on appeal. (*Katsura v. City of San Buenaventura* (2007) 155 Cal.App.4th 104, 107.)

Schulman also complains that the court placed the burden of proof on her, rather than on Karney. She notes, correctly, that where a party is seeking to modify a support order, the burden of

---

[9] An adult child is not entitled to parental support while attending college. (See *Jones v. Jones* (1986) 179 Cal.App.3d 1011.)

17

proof generally lies on the party seeking modification. (See, e.g., *In re Marriage of Cryer*, *supra*, 198 Cal.App.4th at p. 1054 ["The party seeking the modification [of a child support order] bears the burden of showing that circumstances have changed such that modification is warranted."].) Here, Schulman urges, Karney sought to modify the contractual obligation to provide adult support to Daniella and therefore had the burden of proof. But even if Karney had the burden of proof to demonstrate a change in Daniella's circumstances, he did so and, as we discussed, substantial evidence supports the court's finding that Daniella is not, and is not likely to become, incapacitated from working under section 3910. (See *Navigators Specialty Ins. Co. v. Moorefield Construction, Inc.* (2016) 6 Cal.App.5th 1258, 1287–1288 ["If substantial evidence supported the implied finding [made by the trial court], then the trial court's misallocation of the burden of proof would be harmless because there would be no reasonable probability the court's decision would have been different in absence of the error."].)

We also note that the adult support provision states, "the Court shall have jurisdiction over the duty to support Daniella beyond the age of majority pursuant to Family Code Section 3910 and Marriage of Drake … ." This language is broad and authorizes the court to determine *whether*, and to what extent, a duty to provide adult child support exists in the first instance.

Schulman also argues the court was bound by the factual recitals in the Agreement concerning Daniella's special needs. She apparently contends the court lacked jurisdiction to consider Daniella's current medical conditions and was permanently bound by the language of the Agreement. We are unpersuaded. First, Schulman provides no relevant legal analysis supporting

18

her position. Her citation to Evidence Code section 622, relating to burden of proof, is inapposite. Second, and in any event, the adult support provision contradicts Schulman's position. As noted, the Agreement expressly preserves the court's jurisdiction to consider the *issue* of adult support, stating, "the Court shall have jurisdiction over the duty to support Daniella beyond the age of majority pursuant to Family Code Section 3910 and Marriage of Drake." The Agreement does not state, for example, that Karney (or Schulman) is obligated to pay adult support for Daniella's lifetime and that the court would have jurisdiction to consider only the *amount* of that support in future proceedings.

Schulman also claims, without citation to any legal authority, that the court's ruling should be reversed because neither Daniella nor minor's counsel was present during the trial. Because Schulman has not provided any legal analysis on this point, she has forfeited the issue. (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655–656 (*Keyes*) [observing that matters not properly raised or that lack adequate legal discussion will be deemed forfeited]; *Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 867 [noting "an appellant must present argument and authorities on each point to which error is asserted or else the issue is waived"].) And for the record, Daniella submitted a lengthy declaration concerning the issues relating to adult support and the court both admitted and considered that evidence in making its final determination.

## 2. The court did not err in calculating base support or additional support under the Ostler-Smith provision.

### 2.1. Standard of Review

"We review a child support order for abuse of discretion. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 282.) In so doing, we determine ' "whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion." [Citation.] We do not substitute our own judgment for that of the trial court, but determine only if any judge reasonably could have made such an order.' (*In re Marriage of Schlafly* (2007) 149 Cal.App.4th 747, 753 (*Schlafly*).) In exercising its discretion, however, the trial court must follow established legal principles. (*Ibid*.) To decide whether the trial court followed established legal principles and correctly interpreted the child support statutes, we apply the independent standard of review. [Citation.]" *(In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 730–731.)

### 2.2. The court properly ordered base child and spousal support based on the income and other figures to which the parties stipulated.

Schulman asserts that the court's December 31, 2019 order "should be reversed because the inputs in the trial court's support calculations were not supported by substantial evidence." Specifically, she claims that "Karney provided and the trial court accepted, Karney's wages as reported in Box 5 'Medicare wages' on his W-2s instead of relying on the larger, 'gross income' number from payroll statements."

Although Schulman does not identify which portion(s) of the court's order are impacted by this purported error, we

20

presume from her use of the term "inputs" and one reference to child support that she refers to the court's base child support calculation. It is evident from the record, however, that the court calculated base child support using the income numbers to which the parties stipulated. The stipulation constitutes substantial evidence supporting the court's order.

### 2.3. The court properly construed the Ostler-Smith provision.

Section 4053 provides, in pertinent part, that "[a] parent's first and principal obligation is to support the parent's minor children according to the parent's circumstances and station in life" and that "[c]hildren should share in the standard of living of both parents." (§ 4053, subds. (a) & (f); see also *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33, 54 [awarding supported children percentage of noncustodial father's future bonuses ensures they will share in his standard of living].)

Consistent with these principles, the Agreement requires Karney to pay Schulman, over and above base support, 10 percent (child support) and 23 percent (spousal support) of "the gross amount any additional income from any source including, but not limited to, bonus, commission, overtime, or any other compensation from his employment, consultation, or other private services that Karney may provide or may have provided including speaking engagements, public appearances or other such personal efforts, business interests, or other distributions that he may receive including but not limited to income, dividends, royalties, residuals or any other such rights to any work, book, textbook, article, or other work of intellectual property that Karney has created or may in the future create or have any interest in or to." As noted, Karney sought to eliminate

21

supplemental spousal support and reduce by half the supplemental child support following Daniella's 18th birthday. The court eliminated the Ostler-Smith provision with respect to child support (instead crediting Karney with $800 per month of additional income) but left the spousal support provision intact and unmodified. But the court rejected Schulman's argument that Karney's income, for purposes of Ostler-Smith calculations, should include, among other things, unearned income such as monetary gifts received from family members and tax refunds.

Schulman claims that the court "erred in excluding at least $198,000 in income for purposes of Ostler-Smith." Specifically, she contends the court improperly concluded that "income," as used in the Agreement, did not include the following gifts to Karney from his family: a $60,000 wire transfer from a cousin in 2014, a $2,000 monthly allowance Karney received from his parents in 2014, 2015, and 2016, and $66,000 in gifts Karney received from his mother in 2017 and 2018.

In support of her contention that these monetary gifts should be considered income, Schulman cites *In re Marriage of Alter,* a case holding that *regular recurring gifts* may, at the court's discretion, be considered income under certain circumstances. (*In re Marriage of Alter*, *supra*, 171 Cal.App.4th at pp. 736–737.) To the extent it is relevant, this case supports an argument that Karney's income, for purposes of calculating support, should have included the $2,000 monthly allowance from his parents. It is unclear why Schulman relies on this case, however, because Karney *did* pay a percentage of his monthly allowance as supplemental child and spousal support under the Ostler-Smith provision.

22

As to the one-time monetary gifts identified, Schulman offers no legal authority or argument suggesting that such gifts must be included as income in this situation. She has therefore forfeited the issue. (*Keyes, supra,* 189 Cal.App.4th at pp. 655–656 [observing that matters not properly raised or that lack adequate legal discussion will be deemed forfeited]; *Kurinij v. Hanna & Morton, supra*, 55 Cal.App.4th at p. 867 [noting "an appellant must present argument and authorities on each point to which error is asserted or else the issue is waived"]; and see *In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1314 ["[T]he question of whether gifts should be considered income for purposes of the child support calculation is one that must be left to the discretion of the trial court."].)

Finally, Schulman contends the court erred by excluding tax refunds from Karney's income. She notes, correctly, that tax refunds should be considered income in calculating mandatory child support under section 4059. (*In re Marriage of Morton, supra,* 27 Cal.App.5th at p. 1041.) That rule makes sense because child support calculations must be based on a parent's net income, excluding that parent's tax liability.[10] When a support

---

[10] Section 4059, subdivision (a) provides in pertinent part: "The annual net disposable income of each parent shall be computed by deducting from the parent's annual gross income the actual amounts attributable to the following items or other items permitted under this article: [¶] (a) The state and federal income tax liability resulting from the parties' taxable income. Federal and state income tax deductions shall bear an accurate relationship to the tax status of the parties (that is, single, married, married filing separately, or head of household) and number of dependents. State and federal income taxes shall be those actually payable (not necessarily current withholding) after considering

calculation is based on the net amount of a parent's pay after tax withholding and a parent later receives a tax refund, that refund is properly considered part of the parent's net income for the relevant period. That is not the case with the parties' Ostler-Smith provision, however, which is calculated as a percentage of Karney's *gross* income over a certain threshold. Because Karney's tax withholding does not reduce his income for purposes of the Ostler-Smith calculation, any tax refund he receives should not be used to increase his income. Accordingly, we find no error in the court's exclusion of tax refunds from the Ostler-Smith calculations.

3. **The court lacked jurisdiction to modify child support for the period before Karney filed his RFO seeking such relief.**

As noted *ante*, the December 31, 2019 order purports to modify base child support retroactively for the period January 1, 2015 to December 31, 2018. Schulman contends the court lacked jurisdiction to make any order adjusting support for the period prior to March 15, 2019, the date on which Karney filed his RFO seeking support modification. Karney concedes the point. We agree. Section 3651, subdivision (c)(1) explicitly provides, with narrow exceptions not applicable here, that "a support order may not be modified or terminated as to an amount that accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate."

---

appropriate filing status, all available exclusions, deductions, and credits."

## 4. Schulman failed to establish error regarding the court's custody order.

Finally, Schulman asserts that the court's December 26, 2019 order regarding Gabriel's custody schedule should be reversed. But she fails to cite the court's order, fails to offer a coherent explanation of the purported error, and fails to provide any legal analysis to support her views. We therefore decline to consider the issue. (*Keyes, supra,* 189 Cal.App.4th at pp. 655–656 [observing that matters not properly raised or that lack adequate legal discussion will be deemed forfeited].)

## DISPOSITION

The December 26, 2019 order is affirmed. The December 31, 2019 order is reversed to the extent it modifies support for any period prior to March 15, 2019. The December 31, 2019 order is otherwise affirmed. The matter is remanded with instructions to the trial court to modify the December 31, 2019 order's Attachment to Findings and Order after Hearing by striking the second sentence of paragraph 1, and paragraph 4 in full. Respondent Benjamin Karney shall recover his costs on appeal.[11]

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, Acting P. J.

WE CONCUR:

EGERTON, J.

KALRA, J.[*]

---

[11] Karney's January 6, 2021 request for judicial notice is denied.

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.