Filed 8/21/25  Marriage of Grande CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of SHERI L. and WILLIAM R. GRANDE. | |
| | D084120 |
| SHERI L. GRANDE, | |
| Appellant, | (Super. Ct. No. 17FL008443N) |
| v. | |
| WILLIAM R. GRANDE, | |
| Respondent. | |

APPEAL from a postjudgment order of the Superior Court of San Diego County, Victor M. Torres, Judge.  Affirmed.

Cage & Miles and John T. Sylvester for Appellant.

Law Offices of Stephen Temko and Stephen Temko for Respondent.

Appellant Sheri L. Grande appeals from a postjudgment order modifying and terminating in a step-down fashion spousal support she receives from respondent William R. Grande and denying her request for

Family Code[1] section 2030 need-based attorney fees. She contends the family court erred in various ways when conducting its spousal support modification analysis and abused its discretion by denying her request for attorney fees without making required findings. Sheri argues that absent the court's errors, it is likely the result would have been different in part because William manipulated his income and has the ability to pay for both parties' legal representation. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

William and Sheri were married for about 14 and a half years. They lived a comfortable lifestyle; William had built a very successful company doing high-precision machining of aerospace, oil and gas, and other machine parts. The parties separated in 2017, and Sheri petitioned for dissolution that year. They had a prenuptial agreement.

In 2020, the family court conducted a bench trial on issues of the meaning of the prenuptial agreement, characterization and division of separate and community property, spousal support, attorney fees and sanctions. Based on the parties' income available for support and the marital standard of living, it ordered William to pay Sheri $25,000 in monthly spousal support effective June 1, 2021.[2] It also awarded Sheri $250,000 in section 2030 attorney fees based on Sheri's need and William's ability to pay.

Both in its May 2021 statement of decision and in a June 2021 judgment of dissolution, the court gave Sheri a "*Gavron* warning" (*In re*

---

[1] Undesignated statutory references are to the Family Code. We refer to the parties by their first names to avoid confusion, and intend no disrespect.

[2] The court found William's 2019 gross income was $1,348,910, and from 2015 to 2018 his annual income had fluctuated between $1,747,502 and $1,074,269. It estimated Sheri's marital standard of living before housing costs between $15,542 and $27,700 monthly.

2

*Marriage of Gavron* (1988) 203 Cal.App.3d 705),[3] advising her "given her age and apparent work abilities, that she should be looking to build her own future without relying upon [William]." In the June 2021 judgment, the court made specific findings as to Sheri's marketable skills: "From testimony received, Sheri has worked in the restaurant services sector; in administrative services for [William], and as an entrepreneur trying to start [a] vodka business and a dating site. She has not had a job in many years, and there will be time needed for her to establish her own income. Now that this case is concluded, the court would expect her to actively begin to plan for her financial future." The court's statement of decision noted that Sheri's "income and expense declaration does not indicate any budget for education, to either complete her high school or college degrees, or obtain further education for her entrepreneurial endeavors."

In June 2022, William, then 69 years old, petitioned for a change in spousal support. He asserted his income had decreased significantly, and Sheri had not made efforts to become self-supporting. He stated he was "mostly retired" and continued to receive passive income that had decreased since the court's judgment. William claimed over $6 million in debt, including a $1.6 million mortgage on his home, a $2 million line of credit for his company, and a $3 million equipment loan debt. According to William, he could no longer afford to pay $25,000 in spousal support, which was at the

---

[3] The Legislature has codified the so-called *Gavron* warning, giving family courts the option of admonishing the supported spouse that he or she is expected to become self-supporting. (*In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 55; § 4330, subd. (b); see *In re Marriage of Gavron, supra,* 203 Cal.App.3d 705.) If the court expects the supported party to be self-sufficient as of a specified date (and thereby shifts the burden to him or her to show cause for a support extension), the supported party must be made aware of that expectation. (See *Gavron,* at pp. 711-712.)

marital standard of living. He pointed out Sheri had real estate assets including a home in Alpine that she was in the process of selling, stated that she stood to gain approximately $800,000 in cash. Several months later, Sheri filed a request for reimbursement of some assertedly community funds, and for an award of attorney fees.

In November 2023, the court conducted an evidentiary hearing on the respective requests. The parties stipulated to have expert James Good analyze William's income from 2022 to 2023. Good testified that William's income available for support was $78,029 per month. He had spoken with Rick Urban, William's company's chief operating and financial officer, about the company's capital expenditures and determined that those expenditures were $1.8 million for 2019, $2.2 million for 2020, $1,040,000 for 2021, and $185,000 for 2022. According to Good, Urban told him the latter number stemmed from the company's cash flow difficulties and inability to acquire additional financing. Good had reviewed the company's tax returns to see what new equipment was put in place in the most recent years. He adjusted William's cash flow by $440,000 in capital expenditures, but did not include amounts for cash acquisitions of equipment, or transactions after March 2023.

William's expert, Anna Addleman, testified that while Good had determined William's monthly income to be $78,029, she calculated it at $29,751. Addleman was familiar with capital expenditure credits to a party's income as she was one of the experts involved in the underlying proceedings in *In re Marriage of Deluca* (2020) 45 Cal.App.5th 184 (*Deluca*). She reviewed documents and spoke with both William and Urban to calculate actual amounts for cash equipment purchases, loan obligations and in-process financing. Doing so resulted in an adjustment of $49,466, allowing

4

her to calculate $7,022 in adjusted income. Contrary to Good, who reviewed two mortgage loans, Addleman found additional expenditures—including cash purchases and future loans—should have been included in the analysis. According to Addleman, Urban estimated the need for 15 different equipment purchases needed between 2024 and 2026. She included debts incurred after the parties' separation because the principal payments needed to be made to keep William's business going forward, depleting his cash.

Urban, who agreed he and William had become friends during his 14 years of employment with the company, testified that the reason for the decrease in the company's adjusted income was business fluctuations, competition, and the increased cost of business. He also attributed it to the company having older equipment and needing to replace at least 15 pieces of equipment.[4] Urban disagreed that $440,000 was an accurate estimate of the company's capital expenditure allowance; he testified the company would be spending $1.7 million in 2023, and that in the past three of four years it spent $1.3 to $2 million in equipment. He explained that in 2022, the company could not get financing, so it expended about $175,000 in cash for expenditures. On cross-examination, Sheri's counsel asked Urban about a March 2022 e-mail he wrote to William's expert in the underlying trial in

---

[4] Counsel asked Urban for the basis of his statement, and he responded: "Well, they're from the '90's. So you can imagine if you had a car and you ran it 16 hours on a rough road. So if you have a piece of equipment that's cutting metal, has fluid in it, and it's, you know, from the 1990's, it's going to deteriorate to the point where it can't hold tolerances that it requires. So there's some equipment that we can't even use, or it even costs us more to keep it running than what it's worth." Urban also explained that "immediately, there's, you know, 15 pieces that are from the '90's that then gets us to at least the 2000's and then there's probably another 10 pieces there that have to be replaced after that. So at least for the next, let's say, three to five years, there's a significant number of pieces of equipment that need to be replaced."

which Urban asked to "discuss what type of plan [William] could have or should have to try and reduce support." Urban denied there was a plan; he testified William filed his papers in this action because he believed he should have spousal support reduced. With respect to another e-mail Urban sent regarding a 401K distribution William had received, Urban explained that William had withdrawn funds from his 401K to purchase another asset, and Urban wanted to make sure it was not going to be viewed as income or litigated, as the transaction was "converting an asset to an asset." Urban understood that Good did not use the company's tax returns to reach his conclusions. Urban testified that William's prior expert had sent him case authority to alert him about a deduction for principal paydowns; the case was not used for the prior trial.

William, who explained he had only a high school education, testified that his monthly income over the past two years was not sufficient to cover his $25,000 support obligation; so he was borrowing money every month. At 71 years old, William considered himself retired, though he kept an eye on the business. William testified that the business environment had changed in the last few years in that the price of machines and interest rates were double what they were years ago, and there were pricing pressures from customers, and long-term agreements binding the company. The company's income had decreased significantly in the past three years, creating pressure with regard to the company's obligations to him and depleting money to pay bills. William disagreed with Sheri's characterization of the company as his "piggy bank," feeling it was intended to deceive the court because he had to pay back the money to shareholders. William testified he recently paid back $1.9 million in shareholder loans by refinancing a building owned by his trust.

6

William explained why his company "constantly" purchased equipment: machines were perishable with a useful life and had to be replaced when their continued use was not cost-effective and they did not hold necessary close tolerances. He explained the decreased 2022 capital expenditures stemmed from the banking industry and his inability to obtain financing. He testified that interest rates had about doubled since 2020. According to William, Good's estimate of $440,000 in business capital expenditures was "not even close." Good did not solicit his input and he did not consider the cash the company spent for machines, which was well over a million dollars during three of the last four years. William agreed with Urban that they had identified 15 machines that had to be replaced in the next two to three years. He estimated over $1.7 million in total expenditures for 2023. William agreed with Addleman's calculation of his monthly income at $29,000, versus $110,000, which was the court's finding at the time of the previous trial. William testified that he had contributed $490,000 to Sheri's attorney fees, he had paid for the Evidence Code section 730 expert, and he had paid $40,000 for one half of Good's fee.

Presented with various income and expense declarations, William explained he was able to pay Sheri's support while at the same time increasing his assets by a few hundred thousand dollars a year by selling other assets and borrowing against a line of credit and other accounts. William was presented with a financial statement that he submitted to a bank three months before filing his motion showing $1 million in total annual income and a $16.7 million net worth; he agreed it appeared that was what he had reported. When confronted with his motion papers to the court showing lower amounts, he stated, "You know, I don't even know. I'm not an accountant. I don't know about all that stuff, so whatever." Counsel asked

7

William why if paying support was so crippling he had not reduced his personal expenses, and William explained he was always trying to reduce and sell his personal assets. He clarified he never tried to tell the court his income was less than it actually was or reduce his income, and that his income had reduced due to the business environment: increased materials and cost of outside processing as well as labor. He explained he was not the sole person making decisions about what the company paid him for a lease; that there were three other shareholders involved.

Sheri, who did not have a high school degree, testified she had enrolled at a community college in 2017, the year she and William separated, but still had not passed a high school equivalency (GED) examination. She was studying for her GED, taking virtual classes two nights a week (from 6:00 to 9:00 p.m.), but did not know how long she would need to attend class to obtain it. Though she considered herself an entrepreneur, Sheri testified she was not yet making any income from a business venture, and the only employment she had since the parties' 2017 separation was with her attorney's office for about three months, for which she was paid between $17 and $19 per hour. She had taken real estate courses, but never passed the test. She also took courses in Word, business, and Excel since separation, and attempted a business. Sheri characterized her job as taking care of her rental property, for which she had received $4,750 in gross monthly rental income the past year and a half. Before meeting William, she had worked at a restaurant as a teenager, then a grocery store for eight years, then volunteered at her children's school. She never had a job requiring a technical degree or professional license.

Sheri's attorneys had written off $185,464.55 in debt, but she did not report that as income on her 2021 tax return or disclose it in any of her

pleadings. Her law firm also paid $5,000 in court-ordered discovery sanctions without her contribution. Sheri admitted she was a member of a tennis club, and spent over $5,000 per year in dog food. She agreed William had contributed at least $490,000 toward her attorney fees in connection with their dissolution proceedings.

As for the steps she had taken to become self-supporting after the court issued their dissolution judgment in June 2021, Sheri testified she made efforts to refinance her properties so as to pay William $500,000, sold assets, then proceeded to start her own business. She claimed having difficulties in her community college courses due to a learning disability. Sheri was scheduled to retake the GED pretest again in December 2023. She denied refusing to work or turning down employment opportunities. She had applied for hotel jobs offering benefits and retirement plans, but was told she lacked experience and education. She also currently had pending job applications at two school districts and a resort, but had not been called for any interviews. Sheri started a company in 2022 that was intended as a business to care for vacation homes. She denied having recurring sources of income other than spousal support and rent, and explained she currently was paying legal fees in connection with William's request to reduce support. She denied trying to hide any money from the family court.

Sheri reported $30,400 in monthly expenses, more than what she received from William in support. She acknowledged cashing out an insurance policy and receiving $41,900, which she then turned over to William to purchase a Mercedes vehicle that had been obtained during the marriage. Sheri acknowledged she had a bank statement from May 2022 to June 2022 reflecting a $112,130 balance. She admitted after entry of the dissolution judgment she purchased a boat for $63,000, explaining she sold

9

another boat to make that purchase. Though Sheri had eight years of experience as a cashier for a supermarket, she had not applied to any food retailer or other union retailer job.

The trial court issued its ruling from the bench on December 1, 2023. It stated it had reviewed all of the evidence including exhibits and testimony of the parties and their witnesses. On the issue of income available for support, the court found Addleman's testimony and information about William's income and her crediting of capital expenditures "more reliably fact-specific," accurate and relevant to the case than Good's report. It stated that the differences in expert testimony as to William's income related to *Deluca, supra,* 45 Cal.App.5th 184, which facts were "parallel to this matter" in that the "support payor separate property business interest had to pay down business debts that simultaneously increased net worth because of the principal pay down." It found problematic Good's reliance on a prior expert's report to exclude capital expenditures from 2019 as uncharacteristically high compared to prior years.

The court found Urban's testimony "clear" and "reliable"; it acknowledged that Urban had some bias due to his personal relationship with William, but found it was not cause for Urban to give completely unreliable information to the court. As for capital expenditures, the court observed the company was in need of updating and acquiring new equipment, and that the years 2019 through 2021 all reflected significant capital expenditures. It stated: "When I look at the current data points for 2019, 2020, 2021 and 2022, the annual capital expenditures of over a million dollars appears to be regular for the company during that period of time. Why Mr. Good's report considered the 2019, 2020 and 2021 expenditures to be abnormal when it reflected a consistent period of that level of spending is

10

unexplained in the court's view. And, in addition, if you consider 2023, that will reflect four years of a million plus in capital annual expenditures, just as the four years in 2015 to 2018 reflect . . . an average of $400,000 in annual capital expenditures. I did not find Mr. Good's comparison of those two to be compelling." The court rejected the argument that William had made the expenditures to artificially deflate his income; it found they were "necessary" and "made when they were made because of business considerations . . . ." According to the court, the evidence did not support the finding that William was artificially deflating his income. It found the 2023 figures for capital expenditures to be important given William's age and the fact he was considering complete retirement, with his income soon becoming passive.

The court then turned to the section 4320 factors. It pointed out that William had been paying Sheri $25,000 in nontaxable spousal support since June 1, 2021. Based on William's 2022 tax return, which reflected considerably less than the monthly $78,000 that Good had estimated, it found William's decreased income was a material change of circumstances warranting a reduction in spousal support. Referring to the section 4320, subdivision (a) first factor, it found Sheri had the ability to work, though it observed she had not completed, or was close to completing, her GED. The court rejected as without corroboration or medical support her claim of a learning disability preventing her from obtaining her GED and college education. It found Sheri devoted little to no time to domestic duties during the marriage so as to impair her earning capacity. The court found William had been a successful business owner and founder for some time, and Sheri had not experienced those benefits at the time they married. Noting William was 70 years old and mostly retired, it found the parties' marital standard of living was no longer sustainable for either party.

11

As for the parties' needs, the court stated: "[William] is limited to paying [Sheri] a portion of what he receives that is significantly decreased since the trial. I believe that it is significantly lower than the $78,000 [monthly income] estimated by Mr. Good, but I don't think it is as low as the $15,000-some dollars [*sic*] estimated by Ms. Addleman. [¶] [Sheri] has a number of assets that are available to her. She owns an Alpine home. I believe another beach community condo. She has a number of other assets that she has available to her. . . . [She] has been receiving $25,000 per month for a significant period of time. It's more than two years. More notably, she has been able to marshal those assets and income to be able to make large purchases, such as a speed boat that we heard about. . . . And [William's] assets include also a home in Alpine, the Imperial property, the Lakeside property, the Abraham Way property that houses the business, and another property in Mesa Grande, as well as other trust accounts and the business."

The court observed the parties had a long-term marriage of 14 years; both had good health; William was about age 70 and beyond retirement age with complete retirement in the near future; and Sheri was about age 55. It found Sheri's spousal support was not taxable to her, and nondeductible for William for federal tax purposes, but deductible on his California state returns. The court stated: "The six years that [Sheri] has had to attempt to become self-supporting is what it is. It is approaching half of the time of the marriage. . . . The evidence is that she has an ability to work. She has worked for [her attorney's] office. So I don't see that there is any reason that she can't earn an income if she really wants to."

The court estimated William's true monthly income to be approximately $30,000 to $40,000 based on the evidence presented by the

12

parties and the experts' reports.  It then made the following support order: "[E]ffective January 1, 2024, spousal support is reduced to $15,000 [per month].  That will be further reduced as of July 1[ ], 2024 to $10,000. Effective the following year, January 1, 2025, that will be reduced to $5,000. And effective July 1, 2025, it will be reduced to zero.  I think those are the figures that would . . . best serve justice in this case. . . .  [B]ased on the level of income that I see from [William, it would be] unfair to simply reduce [Sheri's support] to zero.  So I'm making . . . what's known as a *Richmond* [*In re Marriage of Richmond* (2020) 105 Cal.App.3d 352 (*Richmond*)] order."  The court did not terminate its jurisdiction over support.

The court denied Sheri's request for attorney fees, explaining it had looked at some of the same factors, the parties' assets and income:  "I do not find that it would be fair to order [William] to pay any further attorney fees in light of the over $400,000 that he has previously paid in this matter. Those payments were made at a time where he was in a much better increased income and asset situation than he is today.  To order [him] to make a significant contribution or to pay all of [Sheri's] attorney fees would basically be saddling him with an unreasonable amount that I don't find that he can pay.  I do find . . . further, that [Sheri] has an ability to pay her attorney fees."  The court declined to make its support order retroactive.  The court's February 2024 findings and order after hearing was consistent with its oral rulings.  The parties did not request a statement of decision.

## DISCUSSION

### I. *Absence of Statement of Decision*

Acknowledging the family court did not issue a statement of decision, Sheri argues that omission does not impact her appeal because the record

13

adequately demonstrates the court's factual and legal findings on spousal support and attorney fees; it is not "silent" on the matters. As a result, Sheri maintains this court should not apply the doctrine of implied findings, that is, we should not conclude the court made all findings necessary to support the judgment on any theory before it.

Either party here could have sought a statement of decision. Under the Family Code, "an order modifying, terminating, or setting aside a support order shall include a statement of decision" if either party requests it. (§ 3654.) " 'A party's failure to request a statement of decision when one is available has two consequences. First, the party waives any objection to the trial court's failure to make all findings necessary to support its decision. Second, the appellate court applies the doctrine of implied findings and presumes the trial court made all necessary findings supported by substantial evidence.' " (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 996; see also *In re Marriage of McHugh* (2014) 231 Cal.App.4th 1238, 1248 [" 'when parties waive a statement of decision expressly or by not requesting one in a timely manner, appellate courts reviewing the appealed judgment must presume the trial court made all factual findings necessary to support the judgment for which there is substantial evidence.' [Citations.] A party who does not request a statement of decision may not argue the trial court failed to make any finding required to support its decision"]; *Abdelqader v. Abraham* (2022) 76 Cal.App.5th 186, 197.) When applying the implied findings doctrine, " 'the necessary findings of ultimate facts will be implied and the only issue on appeal is whether the implied findings are supported by substantial evidence.' " (*Abdelgader*, at p. 197.)

14

Here, Sheri's contentions implicate the implied findings doctrine. In part, she says the family court failed to find she had not taken reasonable steps to become self-supporting, and the court's *Richmond* step-down support order lacks a finding that she would be self-supporting on the July 1, 2025 date set for termination. As for that step-down order, she further complains the court never found she was "completely refusing to work despite competent evidence of available opportunities . . . ." She argues the court omitted from its analysis the fact William "relied on *speculative* loans in calculating income." Under the circumstances, we will imply necessary findings; the question then under the above principles is whether they are supported by substantial evidence. (*Abdelqader v. Abraham, supra*, 76 Cal.App.5th at p. 197.)

## II. *Spousal Support Modification Order*

Sheri contends the family court erred as a matter of law by failing to conduct a proper spousal support modification analysis, and abused its discretion by reducing, then terminating, her support. She advances four specific challenges to aspects of the court's rulings. After setting out the governing law and standard of review, we address each of her points in turn.

### A. *Legal Principles and Standard of Review*

" ' "Permanent spousal support 'is governed by the statutory scheme set forth in sections 4300 through 4360. Section 4330 authorizes the trial court to order a party to pay spousal support in an amount, and for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances set forth in section 4320." ' " (*In re Marriage of Maher & Strawn* (2021) 63 Cal.App.5th 356, 363.)

After a family court has ordered spousal support, it "may modify or terminate spousal support 'at any time as the court determines to be necessary.' [Citations.] ' "A motion for modification of spousal support may only be granted if there has been a material change of circumstances since the last order." ' [Citation.] Although the trial court may not modify spousal support without proof of a change in circumstances, the converse is not true. ' "[A] showing of changed circumstances does not necessarily mandate a modification of spousal support." ' [Citation.] ' "A trial court considering whether to modify a spousal support order considers the same criteria set forth in . . . section 4320 as it considered in making the initial order. [Citation.] The spouse seeking to modify support bears the burden to establish a material change in circumstances." ' " (*In re Marriage of Minkin* (2017) 11 Cal.App.5th 939, 956-957; see also *In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 836.)[5]

"Although by statute the trial court must consider section 4320 factors in deciding whether to modify a spousal support order, the statute does not purport to require the court to address each factor expressly." (*In re Marriage of Diamond, supra,* 72 Cal.App.5th at p. 602.) Further, "[a]fter considering the marital standard of living along with the other statutory

---

[5] "The first of [the section 4320] factors, 'the marital standard of living, is relevant as a reference point against which the other statutory factors are to be weighed. [Citations.] The other statutory factors include: contributions to the supporting spouse's education, training, or career; the supporting spouse's ability to pay; the needs of each party, based on the marital standard of living; the obligations and assets of each party; the duration of the marriage; the opportunity for employment without undue interference with the children's interests; the age and health of the parties; tax consequences; the balance of hardships to the parties; the goal that the supported party be self-supporting within a reasonable period of time; and any other factors deemed just and equitable by the court. (§ 4320, subds. (b)-(*l*).)' " (*In re Marriage of Diamond* (2021) 72 Cal.App.5th 595, 601.)

factors, 'the court may "fix spousal support at an amount greater than, equal to or less than what the supported spouse may require to maintain the marital standard of living, in order to achieve a just and reasonable result under the facts and circumstances of the case." ' " (*In re Marriage of Grimes & Mou* (2020) 45 Cal.App.5th 406, 425.) " 'While spouses must support each other during marriage [citation], the court has been given greater discretion in marital dissolutions to . . . limit such support in an amount and duration that reflects the ability of both parties in contemporary unions to provide for their own needs.' [Citation.] 'The law . . . entitles either spouse to postdissolution support for only so long as necessary to become self-supporting.' " (*Id.* at p. 425.)

The family court has broad discretion to decide whether to modify a spousal support order. (*In re Marriage of Diamond*, *supra*, 72 Cal.App.5th at p. 601.) Thus " ' "the ultimate decision as to amount and duration of spousal support . . . will not be reversed on appeal absent an abuse of [its] discretion." ' " (*In re Marriage of Shimkus* (2016) 244 Cal.App.4th 1262, 1273.) The court's discretion includes "the weight it gives to each [section 4320] factor . . . ." (*Ibid.*) " 'In exercising its discretion the trial court must follow established legal principles and base its findings on substantial evidence. . . . If the trial court conforms to these requirements its order will be upheld whether or not the appellate court agrees with it or would make the same order if it were a trial court.' " (*In re Marriage of West* (2007) 152 Cal.App.4th 240, 246.) " ' "Because trial courts have such broad discretion,

17

appellate courts must act with cautious judicial restraint in reviewing these orders." ' " (*In re Marriage of McLain* (2017) 7 Cal.App.5th 262, 269.)[6]

This court must presume the challenged order is correct. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) All evidence must be viewed most favorably in support of the order. (See *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1531.) Unless express findings are required, "we presume the court followed the law in making its determination [citation], including a consideration of the criteria set forth in [an applicable rule]." (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 698-699; see also *Wilson v. Sunshine Meat & Liquor Co.* (1983) 34 Cal.3d 554, 563 ["it is presumed that the court followed the law"].)

B. *Findings On Sheri's Ability to Support Herself*

Sheri contends the family court erred by finding she had the current ability to support herself; that its findings were premature and not supported by substantial evidence. Pointing to the marriage's long duration and cases that assertedly stand for the proposition that a wife who remains at home may be unable to enter the job market and must be given a "significant amount of time in which to become gainfully employed" (*In re Marriage of Morrison* (1978) 20 Cal.3d 437; *In re Marriage of Beust* (1994) 23 Cal.App.4th 24), Sheri argues "at the time of the [parties'] dissolution, [she] was in her 50[']s, did not have a GED, did not have an independent source of income,

---

6    Sheri initially conceded that the court's support modification order is reviewed under the abuse of discretion standard and its factual findings for substantial evidence. However in her reply brief, she argues the court's misapplication of legal standards and its consideration of undisputed facts on a question of law requires independent, de novo, review. We disagree that review of the court's support modification analysis presents a question of law, but need not fully analyze the point because we will not consider points raised for the first time in reply. (See *In re Marriage of Tara & Robert D.* (2024) 99 Cal.App.5th 871, 889.)

18

and lacked any marketable job skills. Moreover, at the consent of her husband, [she] had spent nearly the entirety of the marriage in the home and caring for her children. Although they separated in 2017, the *Gavron* warning did not issue until 2021, less than *one year* before [William] filed for modification. But the court improperly measured the time that [she] had been warned to become self-supporting back to 2017. . . . In reality, [she] had only been warned to make reasonable efforts *one year* before [William] filed his [request for order]." According to Sheri, the court did not give her a reasonable opportunity to achieve self-sufficiency before terminating support.

There are several flaws in these arguments. They misrepresent the family court's finding, which was not that Sheri had the "current ability to support herself" but that she "has the ability to work," rejecting her claim of a learning disability. They ignore the court's contrary express findings that Sheri "devoted little to no time to domestic duties during the marriage so as to impair her earning capacity" and has "worked for [her attorney's office]" and thus has no "reason that she cannot earn an income if she really wants to." Sheri improperly views the evidence in the light most favorable to herself, contrary to the standards set out above.[7]

Importantly, the court did not immediately terminate spousal support. It found based on Sheri's income "it would be unfair to reduce the support to zero at this time," reduced support incrementally, and terminated support

---

[7]     For example, Sheri points to what she claims is undisputed evidence that she anticipated getting her GED in December 2023, and argues the family court improperly found she was not "even close." In fact, her testimony was she did not know how long she would need to attend classes to obtain that degree, and when asked when she anticipated receiving it, she could only say she was "shooting for December 19[, 2023]," when she was scheduled to take the test again. The court credited Sheri's testimony that she was unsure how long she would need to take college classes to obtain her degree in reaching its finding.

after approximately 17 months—on July 1, 2025—with the expectation that by then Sheri could become self-supporting. The court found Sheri had been previously employed in retail jobs, but that in the six years since the parties' separation she had not sought that kind of employment, instead unsuccessfully pursuing her GED or creating a business that generated no revenue. Sheri's own testimony about her work history is substantial evidence supporting the court's findings, express and implied, that she had work skills, and was employable in some capacity, either as an office worker or supermarket cashier, but had not taken reasonable steps to become self-supporting in those six years. (Compare *In re Marriage of Morrison, supra,* 20 Cal.3d at p. 440 [54-year-old wife had no job skills or training and had a medical problem that cast doubt on her ability to hold full-time employment]; *In re Marriage of Beust*, *supra*, 23 Cal.App.4th at pp. 26, 29 [former spouse, who did not work outside the home during 32-year marriage, was "unemployable" and there was "no evidence in the record that she had any experience, training or education to qualify her for employment"].) The court appropriately considered whether Sheri has delayed seeking employment since the original support order. (*Id*. at p. 453.)[8] "Whether there has been

[8]     *In re Marriage of Morrison*, *supra*, 20 Cal.3d 437, on which Sheri relies, had to do with an *original* support order, and the court terminating its jurisdiction over spousal support. The *Morrison* court explained that while a court should not terminate jurisdiction where the record does not clearly indicate the supported spouse will be able to adequately meet his or her financial needs, that rule "will not require a trial court to retain jurisdiction in every case involving a lengthy marriage." (*Id*. at p. 453.) To the contrary, the family court continues to maintain the discretion to award "no support

. . . unreasonable delay [in seeking employment consistent with the party's ability] is a question addressed peculiarly to the trial court which heard the party's testimony and observed the party's demeanor at trial." (*In re Marriage of Sheridan* (1983) 140 Cal.App.3d 742, 749.)

We are unconvinced by Sheri's arguments that she was not given a reasonable opportunity to achieve self-sufficiency by July 1, 2025, when support was to be reduced to zero. The court reasonably looked beyond the period of time since Sheri received the *Gavron* warning (two and a half years before the court's December 2023 modification decision) and considered her conduct over the history of the case "as a whole." (See *In re Marriage of Schaffer* (1999) 69 Cal.App.4th 801, 809 [assessing spousal support modification decision, appellate court observed there is a "potential for injustice when . . . one judge . . . isn't able to see the case as a whole"; holding judge acted "well within [its] discretion" by looking at "the *whole* of [the supported spouse's] conduct over the 15-year time frame since the judgment"]; see also *In re Marriage of Shaughnessy* (2006) 139 Cal.App.4th 1225, 1247-1248 [family court reasonably looked at the fact that date for spousal support termination was "approximately 11 years after the date of separation" to conclude that achieving the marital standard of living was deserving of less weight in balancing the section 4320 factors; "courts have held the goal of achieving the marital standard of living may decrease in

---

. . . without a retention of jurisdiction . . . ." (*Ibid.*) "Where jurisdiction has been retained in the original order, future modification hearings may well reveal that the supported spouse . . . has delayed seeking employment, or has refused available employment. At that time, the court may appropriately consider such factors in deciding whether or not to modify its original order." (*Ibid.*) *Morrison*'s general rule disfavoring termination of jurisdiction is thus subject to an exception, in the court's discretion, where the supported spouse has shirked an obligation to become self-supporting.

21

relative importance over time"]; § 4320, subd. (*l*) [though the family court must consider the goal that the "supported party shall be self-supporting within a reasonable period of time," the section is not "intended to limit the court's discretion to order [spousal] support for a . . . lesser length of time" based on the other section 4320 factors and the parties' circumstances].)

It was Sheri's burden as the appellant to establish the court abused its discretion in modifying and terminating spousal support as of July 1, 2025. (*Jameson v. Desta, supra,* 5 Cal.5th at pp. 608-609.)  For the reasons expressed above, she has not done so.

C.  Richmond *Step-Down Order*

As stated, in December 2023 the family court ordered that Sheri's spousal support be reduced in six-month step-down increments: from $25,000 per month to $15,000 effective January 1, 2024, then to $10,000 as of July 1, 2024, then to $5,000 effective January 1, 2025, then to zero effective July 1, 2025.

Sheri contends the family court gave an "inadequate basis" for its spousal support step-down order under *Richmond, supra,* 105 Cal.App.3d 352.  She argues its order lacked findings that she would be self-supporting on the date set for support's termination, but instead was based on "unfounded speculation."  Sheri criticizes the court for not specifying "in what field or earning capacity [she] could earn."  According to her, the record lacks substantial evidence "of what [she] could actually earn," or that she could be "self-supporting and simply refused to do so."

In *Richmond*, the court explained that "a spousal support order may, in a proper case, be fashioned so as to encourage such supportive self-reliance, and to discourage delay in preparation for or in seeking, or refusal of, available employment." (*Richmond, supra,* 105 Cal.App.3d at p. 356.)  Such

an order "provid[es] for contingent termination of spousal support on a specific date unless, before that time, the supported spouse brings a motion to modify for good cause . . . ." (*In re Marriage of Khera & Sameer* (2012) 206 Cal.App.4th 1467, 1476.) " 'A *Richmond* order is normally issued with the expectation that if the supported spouse exercises reasonable diligence, he or she will have become self-supporting by the date set for support payments to end.' [Citation.] 'The effect of [such an] order is to tell each spouse that the supported spouse has a specified period of time to become self-supporting, after which the obligation of the supporting spouse will cease . . . . [The order] psychologically prepares the supported spouse for the time when he or she must be self-supporting [and] places the burden of showing good cause for a change in the order upon the one who is most able to exercise the control necessary to meet the expectations the trial judge had in making the order.' " (*Id.* at p. 1477, citing *In re Marriage of Morrison, supra*, 20 Cal.3d at p. 452.)

Sheri has not demonstrated the court abused its discretion in making its *Richmond* order. Sheri cites no authority for the proposition that in making such an order, the court must specify a particular field or earning capacity, or that the evidence must show what she "could actually earn . . . ." Her contentions ignore evidence that she had earlier worked for eight years as a supermarket cashier and more recently worked in an office setting for her attorney, but had not applied for such work in making efforts to become self-sufficient. From this and evidence that Sheri was 55 years old and in good health, the court reasonably found Sheri had an ability to work. We imply a finding that with reasonable effort, Sheri could obtain employment in those particular fields even while taking her evening classes to obtain her GED, but chose not to do so. We imply a finding that such employment, combined with Sheri's rental income, liquid savings, and other assets and

23

equity, would permit her to become self-supporting within the dates the court set for reduction and termination of spousal support. (Accord, *In re Marriage of Shaughnessy*, *supra*, 139 Cal.App.4th at pp. 1232-1235, 1247 [trial court did not err in making *Richmond* order reducing spousal support by half in January 2006 then terminating support in June 2006, after entering original spousal support order in April 2003].)

Citing *In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, Sheri says it is error to calculate support on "the hypothetical procurement of a job which the evidence does not show is directly available to the imputed spouse." The question in *Cohn* was the propriety of the family court imputing income to a party based on earning capacity. (*Cohn*, at p. 927.) *Cohn* explained that "figures for earning capacity cannot be drawn from thin air; they must have some tangible evidentiary foundation." (*Id.* at p. 931.) The appellant there, an attorney, had the ability and willingness to work but was unable to find an employer willing to hire him in an attorney position; despite his applications, the appellant was "unable to procure even one job offer." (*Id.* at pp. 929-930.) The court held that in the case of a professional or tradesperson who was self-employable, "a more appropriate definition of 'opportunity to work' is the substantial likelihood that a party could, with reasonable effort, apply his or her education, skills and training to produce income." (*Id.* at p. 930.) Under this definition, the appellate court found substantial evidence of opportunity, and thus the trial court did not err by imputing income, but the record did not support the amount of income it reached. (*Ibid.*) In that context, the court said: "To calculate support based on the hypothetical procurement of a job which the evidence showed was not available to [the appellant] would effectively write the 'opportunity' element of earning capacity out of existence." (*Ibid.*)

We decline to extend *In re Marriage of Cohn, supra*, 65 Cal.App.4th 923—a case in an inapposite context—to the circumstances here. Sheri disregards the court's implied finding—supported by the evidence—that she could have sought work as a supermarket cashier or office worker, but has chosen not to do so. In short, Sheri has not shown the court abused its discretion in making its step-down *Richmond* order.

D. *Court's Handling of the Company's Capital Expenditures*

As summarized above, the court found much of the difference in expert opinion as to William's income available for support ($78,029 according to Good, and $29,751 according to Addleman)[9] had to do with the crediting of capital expenditures under *Deluca, supra*, 45 Cal.App.5th 184. It accepted Addleman's calculation, which included business debts and capital expenditures that Good did not. The court found those expenditures were not excessive and William was not making them to artificially deflate his income.[10] As for *Deluca*, the family court found that case "noted that

_____

[9] The court's findings say that Addleman had calculated William's income available for support at $15,276. But her report states that William's total income available for support was $29,751, consistent with her testimony at the evidentiary hearing.

[10] Specifically, the family court reasoned: "The principal payments do not appear excessive because they align with the past four years of capital expenditures, except for 2022, and that was explained during the testimony,

possible considerations when deciding whether to include or exclude loan principal payments from income available for support would include such things as where the court reasonably finds the principal payments are excessive, the property encumbered by the loan in question was acquired for the purpose of lowering income available for support, or the payments are unnecessary for the operation of the business at a reasonable level."

Sheri contends the court misapplied the law in its ruling about the company's capital expenditures, pointing to *Deluca, supra*, 45 Cal.App.5th 184 and *In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, both of which involved orders for permanent spousal support and whether supporting spouses should be credited with business expenses or business loan principal payments. (*Blazer*, at pp. 1440, 1441, 1447-1448; *Deluca*, at p. 195.) She argues the "inclusion of the capital expenditures was unreasonable as a hardship on [her], because it is clear from the evidence that they were manufactured by [William] and Urban for the purpose of lowering income available for support, and also that the payments were unnecessary for the operation of the business at a reasonable level." She maintains the evidence shows Urban and William controlled the company's decisions, and as early

___

considering the cash payments and the inability to get loans for that period of time. Further, Ms. Addleman's report further explains information about consolidating some of the loans totaling around $1.8 million with a monthly debt obligation payable through 2032. [¶] . . . The court finds that Ms. Addleman's report, with regards to her calculation of the capital expenditures, seems more accurate and relevant, because unlike Mr. Good's report, it considered the trend in capital expenditures over a four-year time span, 2019-2023, excluding 2022, and considered the most current figures, most importantly for 2023. That is more important to the court because we are faced with a situation where, according to the evidence, [William] is of an age and of a station in life where he is considering complete retirement and that all of his income will soon be passive income."

as 2021, Urban was "hatching [a] plan to modify [William's] support downward . . . ." Sheri argues the court failed to analyze that expert Addleman and William "relied on *speculative* loans in calculating his income"; using loans taken by William post-separation and one loan that was only soon to close. She argues it was error to credit William with the expenditures when the property was acquired for purposes of lowering his income, and he did not prove the payments were "necessary for the operation of the business at a reasonable level." Sheri faults the court for failing to consider the fact that William's loan applications reflected far more income than what he had reported to the experts.

We are not persuaded. This court in *Deluca* observed that *In re Marriage of Blazer, supra,* 176 Cal.App.4th 1438 held that reasonable business expenses may properly be excluded from a spouses's business income in determining income available for support. (*Deluca*, *supra*, 45 Cal.App.5th at p. 196; see also *In re Marriage of Pletcher* (2021) 68 Cal.App.5th 906, 918.) *Blazer* reached this outcome simply by holding substantial evidence supported the lower court's decision that the funds spent to diversify the company's work were reasonable business expenses, and that it was within the court's broad discretion to calculate the spouse's income without regard to those funds. (*Blazer*, at pp. 1447-1448.) In *Deluca*, this court sought to determine the appropriate standard to apply to such questions. Examining out-of-state authorities, *Deluca* set out the following standard for trial courts "faced with the issue of whether principal payments on loans against income-producing properties or business debt in general should be deducted from a party's income available for spousal support. Although such principal payments may increase an obligor spouse's net worth, a trial court retains the discretion to deduct a payment from income

27

available for support if it finds, based on substantial evidence, that the payment reasonably and legitimately reduces the spouse's net income available for support, considering the totality of the relevant circumstances, including the extent to which the payment constitutes an ordinary and necessary business expense and whether disallowing the deduction would work a substantial hardship on the payor spouse." (*Id.* at pp. 198-199.)

The trial court here specifically acknowledged *Deluca*'s holding, and found it presented similar circumstances. *Deluca* teaches that the lower court's inquiry when considering credits for business capital expenditures or loans is factual, turning on whether they are reasonable, legitimate or ordinary and necessary (see *Deluca*, *supra*, 45 Cal.App.5th at p. 199; see also *id.* at p. 198, fn. 26 [quoting Utah court stating "deductibility of particular expenses poses a question of fact, turning on whether such expenses are necessary, and if so, whether or not they exceed those required for the business's operation at a reasonable level"]), and entrusted to the trial court's discretion. (*Id.* at pp. 198-199.) Thus, we review the court's underlying factual findings for substantial evidence, and assess whether it acted reasonably in exercising its discretion. (See *In re Marriage of Macilwaine* (2018) 26 Cal.App.5th 514, 527.) We "confine ourselves to determining whether any judge could have reasonably made the challenged order." (*Ibid.*) In viewing the record for substantial evidence, " ' "[t]he issue is not whether there is evidence in the record to support a different finding, but whether there is some evidence that, if believed, would support the findings of the trier of fact." ' " (*Verrazono v. Gehl Co.* (2020) 50 Cal.App.5th 636, 652.) We do "not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court. [Citations.] The substantial evidence standard of review is generally considered the most

28

difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Marriage of Nakamoto & Hsu* (2022) 79 Cal.App.5th 457, 470.)

Here, the court rejected any inference that William was making the equipment capital expenditures or entered into loans in order to artificially deflate his income, found the expenditures were not excessive, and credited expert Addleman's opinions and report as to those expenditures and loans. The record does not show the court misunderstood *Deluca supra*, 45 Cal.App.5th 184 and *In re Marriage of Blazer*, *supra*, 176 Cal.App.4th 1438 or misapplied them, but instead credited William, Urban and Addleman as to the amount, nature, and necessity of the loans and equipment expenses for William's company. That the record may contain other evidence leading to different inferences or deductions (i.e., William and Urban's control over company decisionmaking; Urban's e-mails inquiring about reducing William's support; William's loan applications reflecting a higher income) does not change the outcome. " 'The fact that there was substantial evidence in the record to support a contrary finding does not compel the conclusion that there was no substantial evidence to support the judgment.' " (*Verrazono v. Gehl Co.*, *supra*, 50 Cal.App.5th at p. 652.) And it is not our role to revisit the court's credibility determinations. (*In re Marriage of Nakamoto & Hsu*, *supra*, 79 Cal.App.5th at p. 470.)

E. *Court's Reliance on Urban's Testimony*

Sheri contends the family court erred as a matter of law by accepting the testimony of Urban, and Addleman to the extent she relied on Urban's input, when Urban's and William's relationship, as well as Urban's communications concerning reducing William's income, demonstrate "obvious bias." Relying in part on *In re Marriage of Adams and Jack A.* (2012) 209

29

Cal.App.4th 1543, she maintains that because those facts are not in dispute, whether Urban was biased against her and in favor of William is a question of law that this court should review de novo. She also argues that Urban did not produce supporting financial statements, implicating Evidence Code sections 412 and 413 such that Urban's testimony should be viewed with distrust. Sheri's arguments are interspersed with other points suggesting that the question is a matter of credibility and weighing the evidence, or an abuse of discretion standard applies.

As a preliminary matter, Sheri does not cite any portion of the record showing she sought to disqualify Urban from testifying or otherwise moved pretrial to exclude his testimony on grounds of bias. (Compare *In re Marriage of Adams & Jack A.*, *supra*, 209 Cal.App.4th at p. 1548 [father moved to remove custody evaluator as demonstrating bias in mother's favor].) Nor did Sheri's counsel object to Urban's direct examination testimony on grounds of bias or partiality. She has arguably forfeited her assertion that, as a matter of law, bias disqualified Urban from testifying. (Evid. Code, § 353, subd. (a) ["a finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] . . . There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"].)

Sheri's contentions are without merit in any event. The issue of bias goes to Urban's credibility, and it was the family court's role to weigh the evidence, assess its truth or falsity, and act as the exclusive judge of witness credibility. (Evid. Code, § 780, subd. (f) [court may consider "[t]he existence or nonexistence of a bias, interest or other motive" in assessing credibility]; *E.G. v. M.L.* (2024) 105 Cal.App.5th 688, 705 ["When assessing witness

30

testimony, ' " ' "it is the exclusive province of' " ' " the trial court ' " ' "to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends" ' " ' "]; *Sabbah v. Sabbah* (2007) 151 Cal.App.4th 818, 823; *People v. One 1950 Studebaker Commander Convertible Coupe* (1953) 116 Cal.App.2d 412, 418 ["[I]t was the province of the trial court to resolve conflicts in the testimony, to choose among permissible inferences, and to evaluate the testimony in the light of the demeanor, apparent candor, bias, interest and motives of the witnesses"].) The court here rejected the notion that any bias Urban had as a result of his and William's personal relationship affected the reliability of his testimony. "We 'may not insert [our] own views regarding the credibility of witnesses in place of the assessments conveyed by the judgment.' " (*E.G. v. M.L.*, at p. 705.) Urban's testimony was not inherently improbable or impossible, thus it constitutes substantial evidence to support the family court's ruling. (*In re Marriage of Aviles & Vulovic* (2022) 79 Cal.App.5th 694, 700 [" 'The testimony of a single witness, unless it is impossible or inherently improbable, will be sufficient to support the challenged findings' "].)

*In re Marriage of Adams & Jack A.*, *supra*, 209 Cal.App.4th 1543 does not compel a different conclusion. That case involved a father's unsuccessful request to disqualify an Evidence Code section 730 child custody evaluator, an expert who is required to be "disinterested" and whose job "involves impartiality and neutrality . . . ." (*Id.* at p. 1562.) A local court rule requires custody evaluators to maintain objectivity, control for bias, and prohibits ex parte communications except in limited circumstances. (*Id.* at p. 1563.) Thus, "impartial objectivity is a critical requirement for [such an] evaluator." (*Ibid.*) The family court found the evaluator had lost his objectivity, but nevertheless denied the father's request to remove him. (*Id.* at p. 1553.)

The Court of Appeal observed that its "threshold inquiry is whether [the evaluator] exhibited bias against father (in violation of Cal. Rules of Court, rule 5.220(h)(1)) prior to father's filing of the removal motion." (*In re Marriage of Adams & Jack A.*, *supra*, 209 Cal.App.4th at p. 1563.) Because the mother did not dispute the evaluator's underlying conduct, the court found that whether the evaluator was biased against father in violation of the rule of court was a question of law that it would review de novo. (*Id*. at p. 1564.) It did not reach that question, however, because it held the family court's factual finding about the evaluator's objectivity "was clearly supported by substantial evidence." (*Ibid*.)

*In re Marriage of Adams & Jack A.*, *supra*, 209 Cal.App.4th 1543 is inapposite to Sheri's claim of bias against Urban, who is not an expert subject to court rules governing impartiality standards. And even if the content of Urban's e-mails is undisputed, Urban's testimony concerning what he meant by those e-mails is subject to differing inferences, which the family court drew in favor of accepting Urban's veracity and objectivity. We accordingly reject Sheri's claim that the court erred as a matter of law by accepting his testimony.

### III. *Attorney Fees Order*

Sheri contends the family court "erred as a matter of law by failing to properly conduct a need-based attorney fee analysis" (bolding omitted) and that its refusal to award attorney fees to her was an abuse of discretion. She maintains the court was required to make express findings with an "in depth analysis" and here, the court did not analyze the obvious disparity in her and William's incomes, which is "largely undisputed" in the record. She argues the court also omitted a mandatory finding on whether William was able to pay for the legal representation of both parties. Sheri argues the court did

32

not accompany its finding about her ability to pay her own fees with any reference to evidence, and it oversimplified the matter by denying her fees because she had previously received attorney fee awards. According to her, the record "compels findings that make the award of attorney fees mandatory."

A. *Legal Principles*

Sections 2030 and 2032 empower the family court to "award fees and costs between the parties based on their relative circumstances in order to ensure parity of legal representation in the action." (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 974; *In re Marriage of McIntyre Shayan & Shayan* (2024) 106 Cal.App.5th 76, 87.) " ' " 'The idea is that both sides should have the opportunity to retain counsel, not just (as is usually the case) only the party with greater financial strength.' " ' " (*In re Marriage of McIntyre Shayan*, at p. 87, quoting *In re Marriage of Knox* (2022) 83 Cal.App.5th 15, 25.)

Subdivision (a)(1) of section 2030 limits fee awards to the amount "reasonably necessary" to maintain or defend the proceeding. Section 2030, subdivision (a)(2) provides: "When a request for attorney's fees and costs is made, the court shall make findings on whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs." The award must be "just and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a).) Under subdivision (b) of section 2032, "[i]n determining what is just and reasonable under the relative circumstances, the court shall take into consideration the

33

need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320." And, "[t]he fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances." (§ 2032, subd. (b).)

These statutes now reflect the mandatory nature of these provisions where a court makes findings of relative disparity and ability to pay.[11] In making attorney fees awards under this statute, family courts must comply with these mandatory provisions; findings must be "explicit" and it is no longer the case that fee awards in these circumstances are left to the family court's "sound" or "broad" discretion. (*In re Marriage of Morton*, *supra*, 27 Cal.App.5th at pp. 1049-1050; *In re Marriage of Knox, supra,* 83 Cal.App.5th at p. 25.) "Pursuant to section 2030, subdivision (a)(2), if the mandatory 'findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs.' " (*In re Marriage of Morton*, at p. 1053.) The court's failure to make explicit findings is reversible error if it causes prejudice: that is, if "there is 'a reasonable probability that

_____

[11] The words "shall" in the above statute replaced the word "may." (*In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1049; see also § 12 [when used in the Family Code, " '[s]hall' is mandatory and 'may' is permissive"].) Since 2010, section 2030 has included the text stating that the court "shall make findings" and "shall make an order granting attorney's fees and costs" if the findings demonstrated certain conditions. (*Ibid*.)

in the absence of the error, a result more favorable to the appealing party would have been reached.' " (*In re Marriage of Morton*, at p. 1051.)

This court reviews the family court's ultimate decision for abuse of discretion (*In re Marriage of Nakamoto & Hsu, supra*, 79 Cal.App.5th at p. 469), but assesses its factual findings under the deferential substantial evidence standard. (*In re Marriage of Knox, supra*, 83 Cal.App.5th at p. 25, citing *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711.)

B. *Though the Family Court Omitted a Finding, Sheri Has Not Demonstrated Prejudice*

On this record, we agree that the family court omitted a mandatory finding. It did not mention the parties' disparity in income or make a finding on that circumstance, and we may not infer such a finding. (*In re Marriage of Morton, supra*, 27 Cal.App.5th at p. 1050 [requiring "explicit" findings].) But the court did find that William could not pay all of, or make a substantial contribution toward, Sheri's attorney fees. An express finding does not need to use exact statutory language; the court's finding was in substance and effect one that William did not have the ability to pay for both parties' legal representation. And the finding is supported by substantial evidence, reflected in William's November 2023 income and expense declaration, that his $30,000 to $40,000 monthly income is offset by over $59,000 in monthly expenses, as well as his testimony that he had to sell assets and borrow against a line of credit and other accounts to pay Sheri support. Thus, we are not convinced by Sheri's argument that the record here compels a finding that an attorney fee award was mandatory. It is only where the family court finds *both* disparity in income and one party's ability to pay for both parties' legal representation that an attorney fee award is mandatory. (*In re Marriage of Morton, supra*, 27 Cal.App.5th at p. 1053.)

Turning to the question of prejudice, we cannot say that if the family court had made the required finding of disparity it would have reached a result more favorable to Sheri. The family court expressly stated it had considered the section 4320 factors, and under them, it could properly take into account William's decreased income, as well as Sheri's assets and savings. It thus adequately considered the "need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320." (§ 2032, subd. (b).) It also found Sheri had the ability to pay for her own attorney fees. While that latter factor, alone, is not "*itself* a bar to an order that the other party pay part or all of the fees and costs requested" (*ibid.*, italics added), the court did not abuse its discretion by considering that factor along with the others, to decide an attorney fee award to Sheri was not appropriate here.

DISPOSITION

The order is affirmed. William Grande shall recover his costs on appeal.

O'ROURKE, Acting P. J.

WE CONCUR:

DATO, J.

KELETY, J.